**Ernest L. NEWTON and Celia M. Newton, Appellants (Plaintiffs below),**

**v.**

**D. S. MISNER and Willie J. Misner, Appellees (Defendants below).**

**No. 3505.**

Supreme Court of Wyoming.

Feb. 15, 1967.

R. G. Diefenderfer, Bruce P. Badley, Sheridan, Elizabeth A. Kail, Lander, for appellants.

W. J. Nicholas, of Nicholas & Thomas, Lander, for appellees.

Before PARKER, C. J., and HARNS-BERGER, GRAY and McINTYRE, JJ.

Mr. Justice PARKER delivered the opinion of the court.

Plaintiffs Newtons sued defendants Misners, alleging that the Misners by a "Standard Purchase Offer, Acceptance and Receipt," hereinafter called "agreement," offered on April 30, 1963, to trade their Cody residence property for the Newtons' Lander residence and to pay plaintiff $12,500 net in cash, $500 down payment being deposited with Toyne, a real estate dealer, who had assisted in the drafting of the "agreement" and had shown the Lander property to defendants; that Misners were called upon to pay the remaining $12,000, had paid $4,748.-44 in addition to the original deposit, had refused to pay the remainder due in the amount of $7,251.56; and further that defendants had executed a warranty deed to plaintiffs for the Cody property, showing the same to be free from encumbrances when the property at the said time had a paving assessment against it for $788.93. On these bases, plaintiffs sought a judgment for $8,040.49. Defendants answered, admitting the trading of the residences by way of the mentioned agreement; asserted that plaintiffs had been represented by their agent Toyne; denied generally; alleged as a second defense vagueness, indefiniteness, and ambiguity of the "agreement," the lack of meeting of minds, and the later stating by the defendants that they would withdraw from the transaction if required to pay the $12,000 claimed by plaintiffs; and pleaded that the amount which they had paid was a settlement and an accord and satisfaction of plaintiffs' claims, and further, that plaintiffs were guilty of laches and estopped. As a third defense, defendants pleaded that the paving assessments were specifically excepted from the operation of the warranty deed for the Cody property. There were numerous pre-litigation maneuverings of the parties by requests for admissions, interrogatories, affidavits, and depositions, some before and some after defendants filed a motion for summary judgment, which was granted by the court, and from which this appeal has been taken.

Plaintiffs have raised several claimed errors, which in perspective can be epitomized as urging that the trial court erred (1) in not finding there to have existed genuine issues of material fact; (2) in misinterpreting the applicable statutes and legal principles in holding that defendants were entitled to judgment as a matter of law.

Both parties recognize that to prevail on the first ground the appellant must show there to have been a genuine issue of material fact;[1] and the primary question before us then relates to that aspect.

1. Shoni Uranium Corporation v. Federal-Radorock Gas Hills Partners, Wyo., 407 P.2d 710, 713.

We have at much pains reviewed the record, which is unduly burdened with improper assertions in the affidavits and depositions, replete as they are with irrelevant statements, argument, conclusions, and other impermissible material, the instances of which we consider unnecessary to point out and delineate. Rule 56(c), W. R.C.P., is clear beyond question that "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts *as would be admissible in evidence,* and shall show affirmatively that the affiant is competent to testify to the matters stated therein." (Emphasis supplied.) The material presented to the trial court as a basis for a summary judgment should be as carefully tailored and professionally correct as any evidence which is admissible to the court at the time of trial,[2] and it is proper that matter which fails to meet the requirements of Rule 56(c) be stricken on motion.[3] Peripheral allusion was made to this in Dixon v. Credit Bureau of Douglas, Wyo., 419 P.2d 707, 709.

The "agreement," dated April 30, 1963, and signed May 7, 1963, need not be set out in toto since it was drawn upon the "Standard Purchase Offer, Acceptance and Receipt, Approved as to form by Wyoming Real Estate Board," which is well known. The "agreement" stated that the buyers, Misners, offered to purchase from the sellers, Newtons, their Fremont County property, Lots 17, 18, 19, and 20, Block 66, Jackson Park, re-dedicated addition, for a total purchase price of $52,500 "on following terms and conditions, to-wit $500. deposit with this offer as part payment to be held by Agent pending exchange of final papers, subject to the following contractural conditions, and the balance of the purchase price to be paid as follows: Buyer will trade in as part payment—$40,000 home on approximate ¾ acre in Cody, Wyoming.

Balance of $12,000 will be paid Sellers agent upon delivery of merchantable title. Sellers will assume Provident Federal loan not in excess of $22,000 on said Cody home. Buyers will assume First Guaranty Loan not in excess of $30,000 on said Lander home." The remainder of the "agreement" was the printed form, with the blanks filled in to show the year's taxes prorated between the parties and actual possession of the sellers' estate to be delivered to buyers on May 15, 1963.

Briefly, the situation prior to and at the time of signing the "agreement" may be stated as follows: Toyne, a real estate agent in Lander, contacted Newton, who was residing in Carson City, Nevada, about the possibilities of showing Newton's Lander property to the Misners, possible purchasers. The occasion for Toyne's call was an inquiry by friends of the Misners, Fred Fraley—a realtor—and Dr. Martin, concerning the Newton property. Newton indicated that he was willing for Toyne to show the property, seeing what could be done about a sale, and Toyne proceeded. Thereafter, the previously mentioned "agreement" was drafted and the Newtons made a trip to Cody, viewed the Misners' property, went to Lander, signed the "agreement," executed a deed to the Lander property, and caused it to be recorded. According to Newton, Toyne and he had a telephone conversation with one or both of the Misners and Fraley on the day the Newtons signed the agreement, the conversation being concluded by one of the Misners saying, "well, I guess we have a house in Lander and all we have to do now is dig up another twelve thousand dollars." Misner denied there was a telephone conversation on that date. According to Newton, at that same time, just prior to the telephone conversation, he had told Toyne he didn't think the Misner house would bring forty

2. Union Insurance Society of Canton, Ltd. v. William Gluckin & Co., 2 Cir., 353 F.2d 946, 952; State of Maryland for Use of Barresi v. Hatch, D.Conn., 198 F. Supp. 1, 3; American Securit Company v. Hamilton Glass Company, 7 Cir., 254 F.2d 889, 893.

3. Ernst Seidelman Corporation v. Mollison, S.D.Ohio, 10 F.R.D. 426, 427.

thousand but that the tenor of the deal was that if he could get his loan paid off and $12,500 and could get out on the Misner house with $35,000 that he would probably be pretty well off because the real estate market in both Cody and Lander was shot. From this point on, the statements of the happenings continue to be incompatible, but it is undisputed that Newton began to complain to Toyne that the deal had not been consummated with the cash balance paid by the Misners to the Newtons. According to Newton, later in May he tried to call the Misners and finally reached Mrs. Misner on the 27th or 28th, asked her if there was any hitch or if the Misners were planning to go through with the deal, and she responded that they were having difficulty in selling their dental clinic in Cody, a prospective purchaser having backed out, that it was a little difficult but that they thought they were going to be able to make it, whereupon Newton said that was fine, that he merely wanted to know and be advised when everything was worked out. Newton said that in June he tried several times without success to call the Misners. On one occasion he said either Fraley or Misner told him financing was still a problem and that Toyne said he knew several loan applications had been unsuccessful and understood negotiations were then going on with one Hugh Jones.

Nancy Cummings, secretary to Toyne, on July 8 sent Newton a letter on behalf of Toyne, enclosing Toyne's check and a "Seller's Settlement Statement," showing the following information:

"CREDITS:

| | | |
|---|---:|---:|
| "TOTAL SALE PRICE: | | $52,500.00 |
| Assigned Escrow Account from First Guaranty Savings & Loan | | $ 169.20 |

"DEBITS:

| | | |
|---|---:|---:|
| "Revenue Stamps | $ 24.75 | |
| Unpaid indebtedness on property assumed by Buyer as part of purchase price and payable to First Guaranty Savings and Loan Association | $29,126.48 | |
| Loan Transfer Charge by First Guaranty | $ 30.00 | |
| Refund Buyers 15 days payment on Cody home | $ 104.00 | |
| Buyers' equity in Cody home (40,000 trade less $22,000.85 Provident Loan) | $17,999.15 | |
| Assigned Provident Escrow Account | $ 210.93 | |
| Due TOYNE REALTY for Commission | $ 2,850.00 | |
| Balance due Seller and paid by Toyne Realty | $ 2,323.89 | |
| "TOTALS TO BALANCE | $52,669.20 | $52,669.20" |

Newton insists that this time he received only a buyer's settlement statement, which recited the purchase price, various credits, including Misners' equity in the Cody property of $17,999.15, and a balance due to sellers of $4,748.44. He said that on July 12 or 13 he had a phone conversation with Mrs. Misner in which he told her he was completely dissatisfied with the proposed settlement, which he had received in the mail from Toyne, that it was not their deal, and he could not go along with it, to which she responded that was all the money they had and they were unable and unwilling to pay any more and maybe they had better back up and start all over again, and he said if she felt that way about it to make him a proposal to back up and start all over again and was told Mrs. Misner would have her husband call him when he returned, but he

had no other conversation with the Misners until about August 4 when he went to Cody and talked personally with Fraley and to Misner on the phone. He said he told Fraley that he was completely unhappy with the proposed settlement and would have no part of it, whereupon Fraley disclaimed any responsibility. Newton said he also told Misner he was unhappy with the deal and since both of them were leaving for Lander they agreed to meet at the Lander property at 4 p. m., but when Newton arrived Misner was not there and he talked to Mrs. Misner, telling her that he was entirely unhappy with the deal and with the fact that they had occupied the Cody property for approximately fifteen days after they had stopped making the payments on the Cody property loan and was then given a check for $104, representing a half of the $208 monthly loan payment. Newton said Mrs. Misner asked if he wanted to back out and start all over again and he said he would; that she asked if he could give them their Cody property back, and he said he could; that she said they would have to be paid for certain painting and moving expenses; and that he responded he didn't feel that should be a charge against him but if they wanted to move back to Cody and give him his house back he would see that they got back all the money they had paid. He said he had no other conversations with the Misners.

Toyne's check for $2,323.89 to Newton was dated July 9, 1963. Newton said that sometime after July 16 Toyne called him and wanted to meet him on July 21 or 22 in Salt Lake City to try to work out something satisfactory, but Newton refused. The record shows that the check for $2,323.89 was endorsed by Newton and cashed—the Misners say sometime prior to August 12, 1963, the date of the paying by the drawee-bank being August 16. It is unquestioned that at the time of the cashing Toyne was in bad financial circumstances and later left the business in Lander; Newton said that this was his reason for cashing the check. The record shows that Toyne made a written statement and two different affidavits as to what occurred. Both the statement, typed at the Iowa scene of Toyne's later employment, and a subsequent version of the same in affidavit form, were disclaimed in another affidavit made at the behest of the defendants. The last mentioned differs from the former in several respects, principally, as far as this controversy is concerned, in the fact that the first gave no indication that the sum from the Misners, the proceeds of which were remitted to the Newtons, was ever considered by the Misners to be a complete settlement of the Newton obligation, whereas the latter affidavit indicates that it definitely was.

■ From a careful analysis of the record, we are convinced that there was a genuine issue as to material facts. This is true from a literal interpretation of the statements of the affidavits and depositions, but is even more clearly evident from unavoidable implications flowing therefrom. Plaintiffs contended that the "agreement" was clear and that they were entitled thereunder to $12,500 in cash while defendants maintained that it was vague, indefinite, and ambiguous. Accordingly, two focal points must be considered: (1) The existence or nonexistence of evidence tending to show that there was oral confirmation at the time of the written agreement by which the Misners would pay the Newtons $12,500 in cash; and (2) If there was an agreement that $12,500 should be paid in cash by the buyers to the sellers, was this altered by a later accord and satisfaction or settlement?

■ Concerning the first, if we assume that defendants' contention of the agreement's ambiguity is tenable, the instrument's purport can be resolved only by resort to conversations and actions at the time, which are in such disagreement as to constitute a genuine issue of material fact. As to the second, whether the actions of the parties resulted in an accord and satisfaction or was at most a nudum pactum, invalid and unenforceable, depends upon a number of

factors. Perhaps the most important of these is that:

"* * * 'To constitute a valid accord and satisfaction, it is essential that what is agreed to be given or performed shall be offered as a satisfaction and extinction of the original claim or demand, that is, that the debtor shall intend it as a satisfaction of such demand, and that such intention shall be made known to the creditor in some unmistakable manner, or that the offer be made in such wise or be accompanied by such acts and declarations as to amount to a condition that if the thing offered is accepted, it is accepted in satisfaction, and such that therefrom the creditor is bound to know or understand such intention and to recognize the existence of such attached condition; and it is equally essential that the creditor shall accept the thing given or agreed with the intention that it shall operate, in accordance with the debtor's intention, as a satisfaction. * * *'" Casper Nat. Bank v. Woodin, 68 Wyo. 232, 232 P.2d 706, 709.

Evidence before the trial court which would throw light upon this point was conflicting. Examples could be highlighted but they are, we think, apparent from our previous recitation, particularly in the instance of the Toyne affidavit, which disputes and disclaims a previous affidavit. There is a substantial conflict in that which he said on the different occasions. We have no hesitancy in saying that such circumstance alone, even without other incongruities presents a genuine issue of material fact unresolvable by summary judgment under Rule 56.[4] Certainly, due process of law and the proper administration of justice do not permit determination of a controversy where the evidence is disputed without an opportunity of the opposing party to interrogate in open court and without a means for the court to evaluate the witnesses who testify. Accordingly, the summary judgment is reversed and the cause is remanded for trial. In view of this disposition, necessity for passing upon the claimed breach of warranty in the deed issued by the Misners is obviated.

Reversed and remanded.

4. See Peckham v. Ronrico Corporation, 1 Cir., 171 F.2d 653, 658.