D. S. MISNER and Willie J. Misner,
Appellants (Defendants below),

v.

Ernest L. NEWTON and Celia M. Newton,
Appellees (Plaintiffs below).

No. 3704.

Supreme Court of Wyoming.

Dec. 23, 1968.

W. J. Nicholas, of Nicholas, Thomas & Nicholas, Lander, for appellants.

Bruce P. Badley, R. G. Diefenderfer, Sheridan, Elizabeth A. Kail, Lander, for appellees.

Before HARNSBERGER, C. J., and GRAY, McINTYRE, and PARKER, JJ.

Mr. Justice McINTYRE delivered the opinion of the court.

Mr. and Mrs Ernest L. Newton sued Dr. and Mrs. D. S. Misner on a contract for exchange of real estate properties.

At first, summary judgment was granted to defendant-Misners. That judgment was reviewed by us in Newton v. Misner, Wyo., 423 P.2d 648. We found genuine issues of material facts and remanded the case for trial. On trial to the court without a jury, the district court awarded judgment for plaintiff-Newtons and the Misners have appealed.

In order to understand the situation presented on this appeal, it will be important to keep in mind that Newtons are suing the Misners and the Newtons have the burden of proof. This means the Newtons, as plaintiffs, must prove mutuality of agreement.

For plaintiffs to prevail, they must do one of two things: (1) Without the aid of parol evidence, they must demonstrate that the written agreement between the parties clearly and without ambiguity expresses the terms contended for by them; or (2) they must rely on the contract being ambiguous and prove the Misners intended the terms to be what plaintiffs claim the parties agreed to.

If the contract is considered ambiguous and subject to parol evidence, then it is not enough for plaintiffs to show what they thought the terms were. They must show that defendants also intended the same terms. On the other hand, the Misners, as defendants, have no responsibility to show mutuality, or to show Newtons intended what was intended by defendants.

The written agreement entered into between the parties is in the form of an offer and acceptance. It describes the Newtons as "Seller," the Misners as "Buyer," and the Lander home of the Newtons as the property being purchased. According to the instrument, the Misners, as buyers, offered to buy the Ernest Newton home on certain terms, the terms considered pertinent to our decision being these:

"* * * for a total PURCHASE PRICE of $52,500 on following terms and conditions, to-wit $500 deposit with this offer as part payment to be held by Agent pending exchange of final papers, subject to the following contractual conditions, and the balance of the purchase price to be paid as follows:

"Buyer will trade in as part payment— $40,000 home on approximate ¾ acre in Cody, Wyoming. Balance of $12,000 will be paid Sellers agent upon delivery of merchantable title. Sellers will assume Provident Federal loan not in excess of $22,000 on said Cody home. Buyers will assume First Guaranty Loan not in excess of $30,000 on said Lander home."

The instrument shows the Newtons, as sellers, accepted the offer made, and real estate broker Merritt Toyne, as agent for sellers, acknowledged receipt of the deposit mentioned in the instrument.

Buyer-Misners delivered seller-Newtons their $40,000 home in Cody; they assumed a mortgage $7,251.56 larger than the mortgage assumed by Newtons on the Cody home; they paid a cash deposit of $500; and in settlement with the real estate broker, Toyne, they made an additional cash payment of $4,748.44. Thus, the total consideration paid by Misners for the Lander home was $52,500.

It is the contention of the Newtons that despite the other considerations the addi-

tional cash payment should be $12,000 instead of $4,748.44, or $7,251.56 more than was paid. The difference is the difference in the size of the two mortgages. If the Newton contention is allowed, it would make a total consideration of $59,751.56 for the Newton home.

We cannot accept the Newton contention that the contract is clear and unambiguous in terms claimed by them. At least two clear and unequivocal statements in buyers' offer contradict Newtons' interpretation. First, Misners offered to buy the Newton home "for a total PURCHASE PRICE of $52,500." That cannot, without parol evidence to establish it, be made a total purchase price of $59,751.56.

Moreover, the offer stated buyers would trade in as part payment a "40,000 home" in Cody. That can only mean the Cody home was, for purposes of this transaction, to be valued at $40,000. Should parol evidence, no matter how strong, be allowed to alter the fact that Misners offered to buy the Newton home "for a total PURCHASE PRICE of $52,500," when the price is so clearly stated? Or again, should any kind of parol evidence be allowed to alter the fact that the Misner home was to be considered a "$40,000 home," when the value is so clearly stated?

It is to be noted that the difference between a $52,500 purchase price, less a $500 down payment, and a $40,000 home in Cody is $12,000. The offer did not state, as plaintiffs continue to argue, that a balance of $12,000 was to be paid "in cash." The language contained is, "Balance of $12,000 will be paid Sellers agent upon delivery of merchantable title." How the balance was to be paid is not stated.

The confusing and somewhat ambiguous part comes in the language stating: "Sellers will assume Provident Federal loan not in excess of $22,000 on said Cody home. Buyers will assume First Guaranty Loan not in excess of $30,000 on said Lander home."

A possible interpretation of the contract would be to say it is to be implied that any

difference between the greater mortgage assumed by Misners and the lesser mortgage assumed by Newtons is to be considered part of the payment on the balance of $12,000.

We felt, however, when the case was before us on summary judgment, that the language of the written offer and acceptance was sufficiently confusing and ambiguous that we could not be sure whether it was intended that buyers would pay $12,000 in cash, and in addition assume a mortgage approximately $8,000 greater than the one assumed by sellers.

### Parol Evidence

Still assuming there was ambiguity in the contract, we are ready to turn to the evidence to see if plaintiffs satisfied their burden of proof by showing mutuality of agreement that Misners were to pay $12,000 in cash, in addition to assuming a mortgage approximately $8,000 larger than the one assumed by Newtons. As we have previously said, it is not enough that Newtons understood that to be the buyers' offer. It must be shown that Misners intended such an offer.

In the former appeal we said, at 423 P.2d 652, we were convinced there was a genuine issue of material fact; and that these two focal points must be considered:

"(1) The existence or nonexistence of evidence tending to show that there was oral confirmation at the time of the written agreement by which the Misners would pay the Newtons $12,500 in cash; and

"(2) If there was an agreement that $12,500 should be paid in cash by the buyers to the sellers, was this altered by a later accord and satisfaction or settlement?"

Concerning the first of these focal points, as to whether there was oral confirmation that Misners would pay $12,500 in cash and in addition assume a mortgage approximately $8,000 greater than the one assumed by Newtons, we fail to find anything in the evidence which would indicate the Newton home had a value, or was ever valued,

substantially in excess of $52,500. Also we fail to find anything in the evidence which would indicate the Misners ever intended to take less than $40,000 for their home.

Indeed, the testimony of Newton himself seems to show affirmatively that the difference in gross value was considered by all parties to be $12,500. The Newtons traveled to Cody and met with the Misners. According to Newton, Dr. Misner told Newton, he had been trying to get $45,000 for his Cody home.

At this point Newton made it clear that parties on both sides were considering the difference in gross value to be $12,500. His testimony was this:

"I am positive that we discussed there was a $12,000.00 difference between the two houses—$12,500.00 difference between the two houses. I am sure I told him that we were taking a beating on it but I couldn't manage a large home, a thousand miles away." [1]

During the lower court's consideration of defendants' motion for summary judgment, Newtons indicated by affidavits and otherwise that they were claiming certain statements and admissions had been made by the Misners, particularly to the effect that Misners were going to pay $12,000 "in cash." It is noticeable that, in the actual trial of the case, the Newtons did not testify to such statements or admissions.

During the direct testimony of Mrs. Newton, she was asked by her attorney about a conversation between her and her husband and Mrs. Misner with respect to price and the cash difference. Then she was asked what the cash figure mentioned was. She answered $12,000. In connection with the figure of $12,000 which was mentioned by the witness several times, she had nothing to say about liens or mortgages against the properties. No statements were attributed to the Misners which would indicate they intended to pay a possible total price of $60,500 for the Newton property, or take less than $40,000 for their property.

Construed in the light of her husband's testimony that the talk was about a difference of $12,000 or $12,500 between the two houses, and in the light of Misners' written offer which specified a total purchase price of $52,500 to be paid by a $500 down payment, a trade-in of $40,000, and a balance of $12,000, the testimony of Mrs. Newton cannot be said to constitute substantial evidence tending to prove that Misners intended to offer their $40,000 home, plus a $500 down payment, plus $12,000 *in cash*, plus assuming a mortgage up to $8,000 greater than the mortgage assumed by Newtons.

Concerning a long-distance telephone conversation between Mr. Newton and Mrs. Misner, Mrs. Newton at first spoke of the $12,000 and then clarified by saying, "I don't know whether he [Newton] said, 'Where is that money?' or 'Haven't you gotten the $12,000.00?'" She went on to explain that she could not say which, but "we" were talking about the $12,000.

We have no reason to doubt that Mrs. Newton had in mind they were to get $12,000 in money, irrespective of the difference in the size of the respective mortgage liens. However, she could only testify to what was done and said. She was not capable of saying what Misners had in mind. That was the ultimate fact to be arrived at by the court.

Perhaps the lack of a meeting of minds on the precise terms claimed by plaintiffs is best illustrated in the direct testimony of Mr. Newton. He was asked by his attorney what was the price total discussed with the Misners. His answer was:

"The price discussed was what you might call the dollar difference and I don't know that any specific dollar value was placed by either party on either house. I told him I didn't care what he valued my house at and he told me that he didn't care what I valued his house at but what we were ultimately concerned with was how net each one of us was going to pay."

1. Mr. and Mrs. Newton were then living in Carson City, Nevada.

Immediately following this answer, Newton's attorney stated that is my next question. "What was that net figure discussed?" The answer was $12,500. Whereupon the examining attorney remarked, "All right. That is all."

Apparently the attorney was pleased with the answer and content to conclude his examination at this point. However, when Newton said, "what we were ultimately concerned with was how net each one of us was going to pay," he can be considered as speaking for himself only. He would be expressing an unacceptable conclusion if he. meant to speak for defendants. Also, when the attorney asked what was the net figure discussed and Newton answered $12,-500, that was an unwarranted conclusion as to what Misners may have had in mind in the discussion.

The important insufficiency of this testimony, as far as plaintiffs' case is concerned, is that Newton did not pretend to testify to what Misners had said. On the other hand, Newton made it clear for once and for all, and it was never contradicted, that no specific dollar value was placed by either party on either house; and that each party told the other party he did not care what he valued his house at.

We can conclude definitely that no specific dollar value was placed on either house in any of the oral conversations. But a specific dollar value was placed on both houses in the written offer made by Misners. There is no parol evidence to show that these dollar values were to be qualified or varied. If Misners paid the full dollar value of the Newton property, whether by cash, by trading in other property, or by assuming indebtedness, it would take rather clear and convincing evidence to prove that both parties intended a different dollar value to be paid for the Newton home. Such proof was not offered in any substantial way.

Regarding the apparent presumption of Newton and his attorney that Newton could speak for himself and the Misners too, when he undertook to testify that "what we were ultimately concerned with was how net each of us was going to pay," we can point out that the testimony of the Misners was clear and unequivocal to the effect that they intended to pay only a total of $52,500 for the Newton property. In other words they intended the payment to be exactly as settlement was made by them with the broker and as the broker actually settled in turn with Newtons.

Broker Toyne did indeed settle with the Newtons on the basis of a total purchase price of $52,500 paid by the buyers as follows:

| | |
|---|---|
| Down payment | $ 500.00 |
| Cody Home | 40,000.00 |
| Assumed mortgage $29,252.41 less mortgage assumed by Newtons $22,000.85 | 7,251.56 |
| Cash money payment | 4,748.44 |
| TOTAL | $52,500.00 |

At the trial Toyne testified to a conversation between himself and Newton. This conversation was well before the transaction was closed. Toyne said:

"All I recall, what was specifically said in the conversation was, Mr. Newton asked when are they going to come up with the twelve thousand bucks and I explained to him over the phone that this wasn't going to be $12,000 in money, it wouldn't total that; we were exchanging equities * * *."

We commented in our previous opinion, 423 P.2d 652, that Toyne had given contradictory affidavits. Regarding such contradiction, Toyne testified the affidavits favorable to Newton were false and that he was coerced into signing them. We need not go into the matter of voluntariness of these previous affidavits. Suffice it to say Toyne's testimony at the trial was corroborative in all respects of the testimony given by and for the Misners.

 It goes without saying that the trial judge had a right to question the

credibility of Toyne's testimony. However, there was nothing in his testimony that corroborated in any manner the evidence of plaintiffs. Therefore, even if Toyne's testimony was entirely disregarded, it would not benefit plaintiffs' case.

All things in the record considered, we are left with the inescapable conclusion that plaintiff-Newtons have failed to meet their burden of proof. They have failed to show by substantial competent evidence that defendant-Misners intended to offer approximately $59,751.56 for the Newton property, by paying $500 down; trading in their $40,000 Cody home; assuming a mortgage $7,251.56 larger than the one assumed by Newtons; and paying $12,000 in cash money.

It matters not that plaintiffs may have proved this was the kind of deal the plaintiffs themselves thought Misners had offered, or that plaintiffs themselves may have gotten that idea from anything that was said subsequent to the offer.

### Paving Assessment

In a second claim, plaintiffs complain there was a $747.81 paving assessment against the Cody property and that defendants warranted the title to be free and clear of all encumbrances. The trial court awarded judgment to plaintiffs for the amount claimed under plaintiffs' second cause of action.

We think the contract is explicit and controlling with respect to installments of special improvement assessments which were not yet due as of the date of the contract. There is no contention that any installments of the paving assessment were due at the time parties entered into their agreement.

One provision in the contract here involved is this:

"All unpaid installments of special improvement assessments and interest there-

on now levied and assessed against said premises and due as of the date hereof, shall be paid by the Seller."

Another paragraph of the agreement provides that Seller shall furnish for Buyer an abstract of title or a title insurance policy, " * * * reflecting merchantable fee title in Seller, subject only to * * * (b) installments not due at date hereof of any special improvement assessments for improvements heretofore completed * * *."

The two provisions referred to clearly make it the duty of buyer to pay installments not due at the time of the contract on any special improvement assessments for improvements already completed.

We are mindful of the fact that the party making the offer to purchase is referred to in the offer and acceptance from as "Buyer," and the party to whom the offer is made is referred to as the "Seller." The offer was made for the purchase of the Newton home in Lander. As a part of this offer, the offerors proposed to trade in their Cody home. Therefore, as to the Cody property, Dr. and Mrs. Misner became the sellers and Mr. and Mrs. Newton became the buyers.

If the provisions we have referred to were not assumed to apply to the traded-in property, then there would be no warranties or special provisions, as far as the contract is concerned, for taxes, assessments, clear title, abstract or title insurance, and the like. We must assume and imply, in the absence of anything to the contrary, that parties intended the printed provisions contained in the agreement to apply to both properties in the same way.

We find the judgment of the district court erroneous with respect to both of plaintiffs' causes of action. Judgment should have been in favor of the defendants on both counts.

Reversed.