2010 WY 102

**Franklin M. RIVERS, Jr., M.D.,**
**Appellant (Plaintiff),**

v.

**MOORE, MYERS & GARLAND, LLC; a Wyoming Limited Liability Company; Joseph F. Moore, Jr.; Glenn M. Ford; and Abigail S. Moore, Appellees (Defendants).**

No. S–09–0048.

Supreme Court of Wyoming.

July 28, 2010.

Representing Appellant: Eldon E. Silverman of Preeo, Silverman, Green & Egle, P.C., Denver, Colorado.

Representing Appellees: W.W. Reeves and Anna Reeves Olson of Park Street Law Office, Casper, Wyoming. Argument by Mr. Reeves.

Before KITE, C.J.*, GOLDEN, HILL, and BURKE, JJ., and KAUTZ, D.J.

GOLDEN, Justice.

[¶1] Franklin M. Rivers, Jr., M.D., (Rivers) filed a complaint against the law firm of Moore, Myers & Garland, LLC, (the Firm) alleging legal malpractice in the Firm's representation of him in his purchase of property on which he planned to construct a medical office building. Among the damages Rivers alleged were "expectancy" damages, the difference between the value of the larger building Rivers planned to build and the smaller building he was ultimately permitted to build under the property's restrictive covenants. Rivers appeals the district court's entry of summary judgment against him on his claim that the Firm's breach of its duty to competently represent him was the proximate cause of the alleged expectancy damages. We affirm.

## ISSUES

[¶2] Rivers presents the following issues on appeal:

1. Is Summary Judgment on Client's legal malpractice claim proper where Law Firm failed to support its Motion for Summary Judgment with any legally sufficient affidavits or testimony from any of its designated expert witnesses?

2. Do genuine issues of material facts exist as to the element of causation on Client's legal malpractice claim which would preclude summary judgment?

3. Do genuine issues of material facts exist as to whether Client has the right to recover damages for his expectancy interest?

4. Do genuine issues of material facts exist as to whether Client has the right to recover damages under the loss of chance doctrine?

## FACTS

[¶3] Rivers is a medical doctor who in 2004 was practicing emergency and family medicine in Jackson, Wyoming. In December 2004, Rivers authorized a business acquaintance, G. Anthony Morse (Morse), to locate and negotiate the purchase of property on which Rivers could build a medical office building. In late January 2005, Rivers asked Joseph F. Moore, Jr., who had both a personal and professional relationship with Rivers, to provide legal advice on the property acquisition and development. Mr. Moore agreed to help Rivers but informed him that because he was too busy with other matters, he would assign other members of the firm to work with Rivers.

[¶4] Ultimately, Rivers purchased property known as Lot 7 in Smith's Plaza, Jackson, Wyoming. Rivers purchased the property with the intention of building a 10,000 square foot building, but in the end, because of size restrictions in the property's restrictive covenants, he was able to build only an approximately 5,000 square foot building. Rivers completed the 5,000 square foot building, but he claimed that he would not have purchased the property at all if he had understood the building limitation.

[¶5] On March 14, 2007, Rivers filed a Complaint against the Firm, alleging legal malpractice and breach of contract. Among the damages Rivers sought were delay damages and damages for the difference in the

---

* Justice Voigt, who is recused from this case, was    Chief Justice at time of oral argument.

value of the building he was able to construct and the 10,000 square foot building he had hoped to construct. In his Complaint, Rivers averred, in relevant part:

8. In or about February, 2005, Plaintiff Rivers engaged Attorneys to provide them legal advice and assistance regarding a proposed real estate purchase contract involving certain real property in Jackson, Wyoming known as Lot 7 of the Smiths # 184 Addition to the Town of Jackson, Wyoming, according to that plat recorded in the Office of the Clerk of Teton County on September 11, 2001 as Plat No. 1029 ("Lot 7"). Attorneys Ford and Abigail Moore reviewed the proposed purchase contract and provided legal advice about whether Plaintiff Rivers could construct a 2–floor, 10,000 square foot medical office building ("Anticipated Development Project"). Plaintiff Rivers also engaged Attorneys to provide legal advice and assistance, prepare all necessary legal documentation, and handle all necessary negotiations in order to complete the Anticipated Development Project.

9. Plaintiff Rivers authorized Attorneys to deal with G. Anthony Morse, Jr. ("Mr. Mo[r]se") on Plaintiff Rivers' behalf related to real estate purchase contract and the Anticipated Development Project.

10. Mr. Morse made clear to Attorneys Ford and Abigail Moore that said Offer to Purchase on behalf of Plaintiff Rivers was to develop the property for Plaintiff Rivers as a medical office building. Mr. Morse provided Attorneys with a copy of a proposed Offer to Purchase and a copy of the Covenants, Conditions and Restrictions ("CC & Rs") regulating the property which he had received from the broker for. the seller of the property.

11. Mr. Morse, acting as an agent for Plaintiff Rivers, explained to Attorneys that Plaintiff Rivers wanted to build a medical office building on the property considerably larger than the existing size specified in the CC & Rs wanting to maximize the property to include a sub-level so the project would be economically feasible. Mr. Morse informed Attorney Ford that this is the first piece of property he and Plaintiff Rivers were attempting to develop and that they were relying heavily on Attorneys' knowledge and expertise in this regard.

12. Attorneys Ford and Abigail Moore advised Mr. Morse that the CC & Rs were "loosely" written, not enforceable, and did not prohibit a basement with regard to the existing footprint. He further stated that the development could clearly be expanded beyond the square footage and footprint designated in the CC & Rs and that no other owners in the shopping center governed by the CC & Rs had complied with the CC & Rs.

13. In reliance thereon, Plaintiff Rivers continued to proceed with the Offer to Purchase and the Anticipated Development Project and utilize the legal services of Attorneys related thereto.

14. On or about February 7, 2005, Mr. Morse, with the knowledge of Plaintiff Rivers and advice of Attorneys, entered into a Contract to Buy and Sale Real Estate ("Real Estate Contract") with Eagle Village Investors, LLC ("Seller") for the purchase of Lot 7. The purchase price was $755,000. An initial non-refundable $5,000 earnest money deposit was paid as part of the Real Estate Contract.

15. At the same time, Mr. Morse assigned all of his rights and interests in the Real Estate Contract to Plaintiff Rivers by way of an agreement entitled "Assignment and Assumption of Contract to Buy and Sell Real Estate" ("Assignment").

16. Pursuant to the terms of the Real Estate Contract, Plaintiff Rivers had until March 17, 2005, in which to investigate and perform due diligence on Lot 7 ("Due Diligence Period"). At the expiration of the Due Diligence Period, Plaintiff Rivers was required to serve upon the Seller a Buyer's Notice to Proceed and pay an additional non-refundable $5,000 earnest money deposit.

17. Attorneys never advised Plaintiff Rivers before or during this Due Diligence Period 1) of the risks of not being able to exceed the designated square footage and footprint for Lot 7 in developing Anticipated Development Project; 2) of the need to

obtain the approval of or a waiver of any objections from the original developer, Smith's Food and Drug Centers, Inc. ("Smith's") for Anticipated Development Project and/or have Smith's modify the CC & Rs; 3) the effects if Smith's would not execute a shared parking agreement if required by the Town; or 4) methods to protect Plaintiff Rivers from unreasonable risk, such as seeking extension of time to continue the Due Diligence Period or proposing contractual conditions precedent to closing including, but not limited to, obtaining preliminary or final approval from the Town and/or Smith's.

18. Shortly before the Due Diligence Period expired, as to necessary required parking spaces, Attorney Ford advised that a shared parking analysis was already approved and that Plaintiff Rivers would only need to get approval of the Town to use that previously-approved shared parking analysis. There was no advise of the need to obtain any approval from Smith's or any other risks to the right to construct the Anticipated Development Project.

19. Plaintiff Rivers is informed and believes, and based thereon alleges, that Attorneys failed to contact Smith's at any time prior to expiration of the Due Diligence Period or prior to closing of the real estate transaction on or about May 12, 2005 ("Closing") to make inquiry as to Smith's position with regard to vital development issues.

20. Also, shortly before the Due Diligence Period expired, Attorneys Ford and Abigail Moore assured Plaintiff Rivers and his representatives that the Anticipated Development Project could be developed at the approximate 10,000 square feet size stating, among other things, not to worry about the City or the CC & Rs and that Attorneys had matters under control.

21. Further, in reliance on Attorney Ford's advice and statements, Plaintiff Rivers paid the additional non-refundable earnest money deposit and authorized the contractor and architect to proceed with the preparation of architectural plans for the Anticipated Development Project, which were completed. Plaintiff Rivers

incurred significant fees and expenses related to the preparation of said plans and in financing charges.

22. Attorney Joseph Moore was also involved in providing and confirming the advice of Attorneys Ford and Abigail Moore to Plaintiff Rivers. In the alternative and additionally, he failed to properly supervise Attorneys Ford and Abigail Moore or do his own independent review of legal issues.

23. After the payment of the additional earnest money deposit, Attorneys continued to provide legal services for the completion of the Anticipated Development Project including, but not limited to, providing legal advice regarding proposed development expenditures and formation of proper business entities. Attorneys failed to advise Plaintiff Rivers regarding any risks and/or obstacles that could impede or interfere with the Anticipated Development Project. If Plaintiff Rivers had been properly advised, he would not have closed on Lot 7 or otherwise proceed.

24. On or about May 12, 2005, the Closing took place and a Warranty Deed was issued from the Seller to Plaintiff Rivers. At Closing, Plaintiff Rivers paid $755,000 to Seller and became obligated for certain loans used to fund the purchase. If Plaintiff Rivers had not closed, his financial losses besides other out-of-pocket development expenses, would have been limited to the earnest money deposits plus attorney's fees.

25. Following Closing, Attorneys continued to provide legal services related to Anticipated Development Project including, but not limited to, receiving and reviewing plans for the over 10,000 square foot project, handling the design-approval process. Attorneys never gave any indication that the building size or design was not feasible.

26. Smith's was finally consulted with regard to the Anticipated Development Project and rejected it. After Smith's, on or about September 9, 2005, rejected Plaintiff River's design plans, Attorneys failed to timely and diligently respond to Plaintiff Rivers', and his representatives',

inquiries and to diligently proceed to resolve issues and salvage the Anticipated Development Project.

27. Finally, on December 5, 2005, Attorney Abigail Moore responded via email to Mr. Morse stating that she has prepared a responsive letter to Smith's outlining why Smith's should approve the Anticipated Development Project. However, in her email she states as follows:

I apologize for how long in [sic] took to produce this document. There were periods when our workloads on litigation matters were consuming all of my time. Be that as it may, I also had a bit of a hard time wrapping my brain and heart around these issues. That may sound a little odd—a lawyer must be able to advocate for his clients needs regardless but I am more persuasive when I truly believe in what I am advocating. The specific issue is why we should be allowed to deviate from the original sketch plan and covenants in what could be seen as an aggressive jump in size and in particular in the parking requirements for this use and this size. I had never looked at the covenants because I was focused on securing the Town of Jackson approval.

She goes on to state:

However, we will likely need Smiths cooperation to get approval from the town if we need any parking off site.... I have been under the impression—until the letter that just came in from Smiths—that the parking agreement was approved ... and signed by all necessary parties and only needed to be recorded.

28. However, again Attorneys failed to timely and diligently respond to Plaintiff Rivers', and his representatives', inquiries and requests for assistance.

29. Having been put in an untenable legal and financial position by Attorneys, Plaintiff Rivers had to substantially change the Anticipated Development Project to his economic detriment but received permission from Smith's to construct only a one-story, 5,000 square foot building on Lot 7 for a medical office building, which is proceeding.

30. Attorney Joseph Moore admitted to misconduct by Attorneys, and Attorneys agreed to reimburse Plaintiff Rivers his damages incurred relating to the Anticipated Development Project and make him whole.

31. Attorneys failed to abide by said agreement.

[¶ 6] On June 2, 2008, the Firm filed Defendants' Motion for Summary Judgment, Partial Summary Judgment, or to Exclude Portions of Expert Testimony. The Firm sought a complete summary judgment on the ground that Rivers had been adequately advised about the restrictive covenants and had made an informed decision to purchase the property. Through its alternative motion for partial summary judgment, the Firm sought to exclude from the case Rivers' claim for expectancy damages—that is, the difference in value between the allowed 5,000 square foot building and the desired 10,000 square foot building. The Firm argued that: (1) Rivers had been competently advised of the covenants' potential restriction on his development of the property, but he chose to purchase the property anyway; (2) the purchase proved to be very profitable; and (3) his claim for the difference in lost profits between the medical office building he wanted to build and the actual profits from the building that he did build, was not recognized in law.

[¶ 7] The district court denied the Firm's motion for complete summary judgment, but it granted the motion for partial summary judgment. The Firm had argued in support of its motion for partial summary judgment that Rivers had never made a claim that better lawyering could have produced approval for a larger building and was therefore not entitled to the alleged expectancy damages. The district court granted the motion, but it framed the issue differently. It found that there was no causal connection between the Firm's actions and Rivers' inability to construct a larger building. The district court reserved ruling on the Firm's expert testimony motion, and thus this Court's review is limited to the question of

whether there are any disputed issues of material fact relating to Rivers' claim for expectancy damages that would preclude summary judgment on that claim.

## STANDARD OF REVIEW

[¶ 8] Rule 56 of the Wyoming Rules of Civil Procedure governs summary judgment proceedings. Rule 56(c) provides that "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories ... together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." We have said that "[t]he material presented to the trial court as a basis for a summary judgment should be as carefully tailored and professionally correct as any evidence which is admissible to the court at the time of trial." *Braunstein v. Robinson Family Limited Partnership*, 2010 WY 26, ¶ 13, 226 P.3d 826, 832 (Wyo.2010); *Newton v. Misner*, 423 P.2d 648, 650 (Wyo.1967); *see also White v. Woods*, 2009 WY 29A, ¶ 18, 208 P.3d 597, 602 (Wyo.2009). We have further stated:

> [I]f the movant has made and supported its motion as required, "an adverse party may not rest upon the mere allegations or denials of [its] pleadings," but that party's response, "by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." However, the non-moving party has no obligation to counter the motion with materials beyond the pleadings until the movant has made a prima facie showing that genuine issues of material fact do not exist.

*Braunstein*, ¶ 15, 226 P.3d at 832 (quoting W.R.C.P. 56(e)).

[¶ 9] This Court's standards for reviewing a district court's summary judgment are well established:

> We treat the summary judgment movant's motion as though it has been presented originally to us. We use the same materials in the record that was before the district court. Using the materials in the record, we examine them from the vantage point most favorable to the nonmoving par-

ty opposing the motion, giving that party the benefit of all favorable inferences which may fairly be drawn from the materials.

*Braunstein*, ¶ 16, 226 P.3d at 833 (quoting *Bangs v. Schroth*, 2009 WY 20, ¶ 20, 201 P.3d 442, 452 (Wyo.2009)). Our appellate review is de novo with no deference afforded the district court's findings. *Id.*

[¶ 10] "Summary judgment is a drastic remedy designed to pierce the formal allegations and reach the merits of the controversy, but only where no genuine issue of material fact is present." *Braunstein*, ¶ 15, 226 P.3d at 833 (quoting *Mathisen v. Thunder Basin Coal Co., LLC*, 2007 WY 161, ¶ 9, 169 P.3d 61, 64 (Wyo.2007)). "Summary judgments are especially not favored in professional malpractice actions, whether legal or medical." *Bangs*, ¶ 20, 201 P.3d at 452. With respect to whether a genuine issue of material fact exists, we have said:

> Materiality of a fact depends upon it having some legal significance so that it establishes or refutes some essential element of a cause of action or defense asserted by one of the parties. In any given case, the materiality of any facts is limited by the pertinent legal standard[s] for the asserted claim and for the corresponding defenses to that claim.

*Braunstein*, ¶ 16, 226 P.3d at 833 (quoting *Roussalis v. Wyoming Medical Center, Inc.*, 4 P.3d 209, 228 (Wyo.2000)).

[¶ 11] Applying Rule 56 and our foregoing standard of review and summary judgment principles, we next examine the record before us to determine whether the district court correctly concluded that Rivers did not make a showing sufficient to avoid summary judgment on his claim for expectancy damages.

## DISCUSSION

### *Summary Judgment Grounds*

[¶ 12] The elements of a legal malpractice claim are: 1) the existence of a duty arising from the attorney/client relationship; 2) the accepted standard of legal care; and 3) the departure by the attorney from the stan-

dard of care which causes harm to the client. *Horn v. Wooster*, 2007 WY 120, ¶ 10, 165 P.3d 69, 72 (Wyo.2007); *Rino v. Mead*, 2002 WY 144, ¶ 16, 55 P.3d 13, 19 (Wyo.2002). Rivers alleged that the Firm committed malpractice by failing to adequately warn Rivers of the property's development restrictions and by delaying in taking action on Rivers' behalf to address those development issues. For purposes of the Firm's summary judgment motion, the district court assumed that the Firm did deviate from the standard of care in its work on the Rivers matter. The court then focused its summary judgment analysis on determining whether that assumed breach of duty caused Rivers' expectancy damages.

[¶ 13] As in any negligence action, a plaintiff in a legal malpractice action must prove that the breach of the standard of care was both the cause in fact and the proximate cause of the injury. *Meyer v. Mulligan*, 889 P.2d 509, 516 (Wyo.1995). We have defined the required causation as follows:

> [I]f the conduct is "that cause which in natural and continuous sequence, unbroken by a sufficient intervening cause produces the injury, without which the result would not have occurred," it must be identified as a substantial factor in bringing about the harm. If, however, it created only a condition or occasion for the harm to occur then it would be regarded as a remote, not a proximate, cause, and would not be a substantial factor in bringing about the harm.

*Anderson v. Duncan*, 968 P.2d 440, 442 (Wyo.1998) (quoting *Buckley v. Bell*, 703 P.2d 1089, 1092 (Wyo.1985)).

[¶ 14] Rivers' claim for expectancy damages is premised on the contention that if the Firm had fulfilled its duty to adequately represent Rivers, and done so without delay, Rivers would have been able to build a 10,000 square foot building on Lot 7. As the district court concluded, this premise finds no support in the record.

[¶ 15] As observed by both Rivers' own expert and the real estate attorney from which Rivers sought a second opinion, the restrictive covenants governing Lot 7 limit the size of any building on Lot 7 to 4,200 square feet. There is simply no indication in the record that if the Firm had performed its duties differently or more expeditiously that Smith's would have agreed to construction of a building that is over twice the size of the building permitted by the covenants. The record is thus devoid of any indication that the Firm's conduct was a substantial factor in Rivers' inability to build his desired 10,000 square foot building.

[¶ 16] In response to this void in the record, Rivers makes two arguments. First, Rivers contends that the Firm failed to present affidavits showing that Smith's would not have agreed to a 10,000 square foot building if the Firm had acted expeditiously. In the absence of such affidavits, Rivers argues that a genuine issue of material fact exists as to the question of causation and the entry of summary judgment was thus contrary to W.R.C.P. 56. Second, Rivers contends that the record does contain evidence to support the causal link between the Firm's conduct and Rivers' inability to build his desired 10,000 square foot building.

### Lack of Affidavits

[¶ 17] Rule 56 does not support Rivers' contention that without affidavits, questions of material fact preclude an entry of summary judgment. Both Rule 56 and our definition of materiality permit consideration of the pleadings, with or without affidavits, to determine whether summary judgment is proper. *See* W.R.C.P. 56(c) ("[t]he judgment sought shall be rendered forthwith if the *pleadings,* depositions, answers to interrogatories . . . together with the affidavits, *if any,* show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law") (emphasis added); *see also Braunstein,* ¶ 16, 226 P.3d at 833 (quoting *Roussalis,* 4 P.3d at 228) ("the materiality of any facts is limited by the pertinent legal standards for the asserted claim and for the corresponding defenses to that claim").

[¶ 18] Here, Rivers' pleadings contain no claim or allegation that, but for the Firm's actions, Smith's would have agreed to the larger building. Rivers instead alleged that had he been adequately advised of the limita-

tions imposed by the restrictive covenants, he would not have purchased Smith's property. The first and only time Rivers made an allegation that the Firm's conduct cost him Smith's agreement to a 10,000 square foot building was in his appeal brief to this Court, wherein he stated: "The facts set forth in Rivers' Opposition tend to show that Smith's and the Town's positions likely would have been different if not for Law Firm's breaches of duty," and "[n]umerous facts, including the advice and delays by Law Firm, may have gone into Smith's ultimate decision that would not have been in place prior to closing if Law Firm did not breach its duties[.]"

[¶ 19] Rivers' late coming allegations are insufficient to stave off summary judgment. A party cannot avoid summary judgment by demanding affidavits, or any other evidence, against an allegation that was never pled. Additionally, Rivers does not specify which facts show that the positions of Smith's or the Town of Jackson may have been different, or cite to any evidence in the record to support such allegations. The allegations are vague, speculative and conclusory and cannot create a disputed issue of fact in the face of the competent evidence the district court had before it showing no one expected Smith's to agree to a 10,000 square foot building, under any circumstances:

—the testimony of Rivers that he knew before closing that Smith's was up in arms over the covenants violation by another owner in the development;

—the testimony of Rivers that had he known of the size limitations prescribed by the covenants he would not have purchased the property; and

—the opinion of Rivers' own expert that "while [the] delay is a matter of some concern in the context of Ms. Moore's obligation to her client to act with reasonable diligence and promptness, the delays did not seem to be the underlying cause of the damage experienced by Dr. Rivers."

[¶ 20] Even in the absence of affidavits, the record presents no genuine issue of material fact as to the causal link between the Firm's conduct and Rivers' inability to build a 10,000 square foot building on Lot 7. There is no allegation or evidence that, had the Firm complied with its duties, Smith's would have changed its position on the building size. In the absence of such allegation or evidence, the district court correctly granted the Firm's motion for partial summary judgment.

### Expert Opinion on Causation

[¶ 21] Rivers' second argument in opposition to the entry of summary judgment is that the record does in fact contain evidence that the Firm's conduct caused Rivers' expectancy damages. In support of this argument, Rivers cites to the following opinion of its expert, John Rogers:

I have not been provided with calculations concerning Dr. Rivers' alleged economic loss but, assuming that he can establish an economic loss by virtue of the fact that he was only allowed to build a 5,000 square foot building versus a 10,000 square foot building as well as the associated cost related to redesign, the fact that Dr. Rivers was not, in my opinion, properly counseled concerning the nature and effect of the Covenants would be a proximate cause of those damages.

The district court rejected this evidence on the basis that it lacked foundation. We agree.

[¶ 22] Rule 56 requires that an affidavit supporting or opposing a summary judgment motion must be made based on personal knowledge, set forth admissible facts, and show that the affiant is competent to testify to the matters stated in the affidavit. W.R.C.P. 56(e). As noted above, "the material presented to the trial court as a basis for a summary judgment should be as carefully tailored and professionally correct as any evidence which is admissible to the court at the time of trial." *Braunstein*, ¶ 13, 226 P.3d at 832. An affidavit that lacks foundation and specific supporting facts is inadequate for purposes of opposing a summary judgment motion. *See Braunstein*, ¶ 14, 226 P.3d at 832; *Bangs*, ¶ 24, 201 P.3d at 452–453 (affidavit insufficient for failing to state specific facts and for stating only categorical assertions of ultimate facts without specific supporting facts); *Western Surety Co. v. Town of Evansville*, 675 P.2d 258

(Wyo.1984) (affidavit containing significant opinions and conclusions that may be critical in the outcome of the case must reveal the underlying facts and basis); *Blackmore v. Davis Oil Co.*, 671 P.2d 334 (Wyo.1983) (conclusory affidavit which does not contain specific facts indicating presence or absence of genuine issue of material fact is inadequate); *Keller v. Anderson*, 554 P.2d 1253 (Wyo.1976) (affidavit containing only affiant's conclusions and hearsay unsupported by competent material factual statements cannot be used by court in disposing of summary judgment motion).

[¶ 23] As the district court observed, these are precisely the defects found in the affidavit opinion of Rivers' affidavit. The district court described the missing foundational facts as follows:

> It would be helpful to the trier of fact if the expert opinion could explain how the Defendant's breach of the standard of care caused the Plaintiff to not be able to build a larger building. The regulations prohibiting a 10,000 square foot building were a known limitation when the Plaintiff purchased the lot. It is obvious that the Plaintiff deliberately, and commendably, chose not to follow the Defendants' first recommendation of "go ahead and build it. Let them sue you." However jaded this advice may have been, if followed, it would have produced the desired result along with the undesirable consequences of litigation. The other option, involving persuasion of both Smith's and the City was dependent in part on their acquiescence. The expert has not explained how the Defendants' efforts would have made the desired change of heart happen. As a result, his bald assertion that the Defendants' negligence caused the Plaintiff's damages is a conclusion unsupported by foundational facts and is inadmissible. W.R.E. 702; *Hatch v. State Farm Fire & Casualty Co.*, 930 P.2d 382, 388–89 (Wyo.1996[1997] ).

[¶ 24] The conclusory opinion of Rivers' expert attempts to impermissibly shift Rivers' business loss to the Firm without showing that the loss suffered was in fact caused by the Firm's alleged malpractice. *See Viner v. Sweet*, 30 Cal.4th 1232, 135 Cal.Rptr.2d 629, 70 P.3d 1046, 1051–52 (2003) (causation must be shown before business loss may be shifted to attorney who performed underlying legal work); *Gayhart v. Goody*, 98 P.3d 164, 169 (Wyo.2004) (must establish attorney's conduct was legal cause of damages). The district court thus correctly rejected the evidence and concluded that Rivers' claim for expectancy damages must fail as a matter of law.

### Loss–of–Chance Doctrine

[¶ 25] As another ground to pursue his claim for expectancy damages, Rivers asserts that summary judgment was improper because there are genuine issues of material fact as to whether Rivers may recover those damages under the loss-of-chance doctrine. The district court rejected Rivers' loss-of-chance argument on the ground that the doctrine applies only where a plaintiff can show a physical injury to person or property. We agree that this is not the type of case for which a claim may be made under the loss-of-chance doctrine, but we do not believe that this case presents the need to address the physical injury distinction or to address whether the doctrine may apply to any legal malpractice case.

[¶ 26] The loss-of-chance doctrine typically arises when a plaintiff seeks to recover damages against a medical provider who has reduced the plaintiff's chances of survival. *McMackin v. Johnson Cty. Healthcare Ctr.*, 2004 WY 44, ¶ 7, 88 P.3d 491, 494 (Wyo.2004). To prevail on a loss-of-chance claim, the plaintiff must show: 1) that the patient has been deprived of the chance for successful treatment; and 2) that the decreased chance for successful treatment more likely than not resulted from the provider's negligence. *McMackin v. Johnson Cty. Healthcare Ctr.*, 2003 WY 91, ¶ 15, 73 P.3d 1094, 1098–99 (Wyo.2003).

[¶ 27] To date, we have permitted recovery of damages under the loss-of-chance doctrine in only medical malpractice cases. *See Gayhart*, ¶ 13, 98 P.3d at 168 (declining to consider whether the loss-of-chance doctrine should apply to legal malpractice cases). This case does not present the proper cir-

cumstance to address the doctrine's application to legal malpractice cases.

[¶ 28]   First, Rivers has presented no explanation as to why recovery pursuant to our usual case-within-a-case requirement of proof would not provide an adequate basis for recovery in this case. If it were the case that Rivers lost an opportunity to build a larger, more profitable building because of the Firm's actions, that would be a matter on which concrete evidence could be presented in the form of witness testimony or real estate listings. This case simply does not present circumstances in which the odds must be calculated to determine whether an opportunity was lost. Further, even if this did present such a circumstance, Rivers has not designated an expert to testify as to the basis for quantifying the percentage chance that may have been lost by the Firm's alleged malpractice. Without such testimony, any recovery would be based on the type of speculation and conjecture we do not permit as a basis for damages. *See Chrysler Corp. v. Todorovich,* 580 P.2d 1123, 1134 (Wyo. 1978).

[¶ 29]   We do not with this decision declare that there can never be a circumstance under which the loss-of-chance doctrine may apply to a legal malpractice claim. This case does, however, fit squarely within the parameters of the type of case in which the doctrine should have no application.

> Observing that the jury in a legal malpractice action has the opportunity to decide, in retrospect, the probable outcome of the "case within the case" also helps capture why the analogy to suits against physicians ultimately breaks down. The critical prerequisite to employment of loss of a chance in the medical context is the existence of reliable statistical information, gleaned from rigorous studies that are typically generated outside the context of litigation, as to the survival rates of patients who are classified by reference to various objective characteristics. This is the sort of information that tells us that a Hispanic woman who is forty years old, and presents a certain medical profile, has a thirty percent chance of surviving a cancer of a given type if it is diagnosed and treated in a certain way. The presence of this sort of reliable statistical information, which is capable of being introduced to the jury at trial by a competent expert witness, helps explain the concern behind, and perhaps the propriety of, the adoption of loss of a chance in the medical setting. For certain kinds of patients, we know with some confidence that three out of ten would survive without malpractice. Yet we also know that, absent a change in the rules on proof of causation, none of those who suffer malpractice and would have survived in its absence will ever recover.
>
> There is simply no comparable ground motivating the adoption of loss of a chance in legal malpractice. Because we are dealing with outcomes determined almost entirely by human interactions, rather than events dominated by biological processes, there is now, and may always be, a dearth of controlled studies and meaningful statistical information that might permit a qualified expert justifiably to assign a percentage chance of success to a given type of legal claim. Likewise, there is no well-defined body of expertise that purports to set standards for the drawing of sound inferences about the chances of prevailing on a given kind of legal claim. In short, the jury in a legal malpractice claim is not being presented with sound statistical information as to whether, absent malpractice, this sort of client, in this sort of circumstance, has a three in ten chance of prevailing. Rather, the jury is necessarily required to consider the "case within the case" as a one-off event. Thus, even granting that attorneys, like doctors, owe it to their clients to take reasonable steps to provide them with the best odds of prevailing, loss of a chance seems out of place in the realm of legal malpractice.

John C.P. Goldberg, *What Clients are Owed: Cautionary Observations on Lawyers and Loss of a Chance,* 52 Emory L.J. 1201, 1212-13 (2003).

## CONCLUSION

[¶ 30]   The record contains no evidence or pleadings in support of Rivers' claim for expectancy damages, and this case does not

present circumstances that would compel extension of the loss-of-chance doctrine to legal malpractice claims. The district court thus properly granted the Firm's motion for partial summary judgment.