2024 IL App (1st) 230033

SECOND DIVISION
December 24, 2024

No. 1-23-0033

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

PBKM, LLC, an Illinois Limited Liability Company;        )
PBKM DISPENSARY 2, LLC, an Illinois Limited Liability)
Company; and PBKM DISPENSARY 9, LLC, an Illinois   )
Limited Liability Company,                           )
                                                     )
    Plaintiffs-Appellants,                          )
                                                     )   Appeal from the
    v.                                              )   Circuit Court of
                                                     )   Cook County.
KUTAK ROCK, LLP, a Nebraska Limited Liability        )
Partnership; CHRISTOPHER P. PARRINGTON;              )
TREES ILLINOIS, LLC, an Illinois Limited Liability   )   21 L 7458
Company; TDM, LLC, a Colorado Limited Liability      )
Company, d/b/a Trees; TIMOTHY E. BROWN;              )
CANNABIS CAPITAL GROUP, LLC, an Arkansas             )   Honorable
Limited Liability Company; and EDDIE ARMSTRONG,      )   Daniel J. Kubasiak,
                                                     )   Judge Presiding.
    Defendants,                                     )
                                                     )
(Kutak Rock, LLP, Christopher P. Parrington, Cannabis )
Capital Group, LLC, and Eddie Armstrong,             )
                                                     )
Defendants-Appellees).                               )

_____

    JUSTICE ELLIS delivered the judgment of the court, with opinion.
    Presiding Justice Van Tine and Justice Howse concurred in the judgment and opinion.

**OPINION**

¶ 1    In 2019, the Illinois legislature enacted the Cannabis Regulation and Tax Act, authorizing

the recreational use of marijuana and creating an application process to award a specified number

of licenses to operate cannabis dispensaries in various regions around the state. Applicants who

complied with certain social-equity criteria were given added points on their application. If the number of successful applicants exceeded the number of available licenses, the state would hold a lottery to determine the winners.

¶ 2     Lance Tyson, who qualified under the social-equity criteria, retained the law firm of Kutak Rock to assist him in creating a number of corporate entities that could apply for these dispensary licenses as social-equity applicants. Kutak Rock ultimately created 10 different LLCs to sell cannabis in various geographic areas throughout Illinois, ostensibly with Tyson as the majority owner and operator.

¶ 3     The amended complaint alleges that Kutak Rock created an unnecessarily complicated, multilayered corporate structure that introduced several entities and individuals besides Tyson into the company. The resulting corporate structure, according to the amended complaint, deprived Tyson of majority ownership and control, rendering it noncompliant with the law's social-equity requirements. Ultimately, state regulators rejected 2 of these 10 dispensaries' applications, allegedly for this very reason.

¶ 4     The two dispensaries whose applications were rejected sued Kutak Rock and other individuals and entities associated with the formation of these corporate structures for legal malpractice and other torts. The trial court dismissed the amended complaint with prejudice on two grounds. First, the court determined that the corporate entities Kutak Rock set up did, in fact, comply with the social-equity requirements of the law, and thus there was no malpractice.

¶ 5     And second, the court ruled that the plaintiffs' damages were too remote, as their chance of winning the lottery, even had their applications been approved, was less than two percent. The court further ruled that plaintiffs could not recover for their loss of a chance to participate in the

lottery, reasoning that Illinois law has never recognized recovery for loss of chance in legal malpractice actions or other tort claims.

¶ 6     Our review of the corporate documents does not convince us that Kutak Rock drafted a corporate structure that satisfied the social-equity requirements of state law. And we hold that, under the unique facts of this case, where the chance of winning the lottery could be calculated to a mathematical certainty, the law should allow a remedy for plaintiffs' lost chance at participating in the lottery. We thus reverse the court's dismissal of the legal-malpractice count. We affirm the dismissal of the remaining counts.

¶ 7                                    BACKGROUND

¶ 8     As this case comes to us after dismissal under section 2-615 of the Code of Civil Procedure, we draw our facts from the well-pleaded allegations of the amended complaint and its attached exhibits. 735 ILCS 5/2-615 (West 2022); *Walworth Investments-LG, LLC v. Mu Sigma, Inc.*, 2022 IL 127177, ¶ 40. We also reference government documents that are subject to judicial notice. See *Project44, Inc. v. FourKites, Inc.*, 2024 IL 129227, ¶ 18.

¶ 9                               I. General Background

¶ 10    In July 2019, Illinois passed the Cannabis Regulation and Tax Act (the Act). See Pub. Act 101-27 (eff. June 25, 2019) (adding 410 ILCS 705/1-1 *et seq.*)). The Act legalized the recreational use of marijuana effective January 1, 2020. The state created a pool of 75 dispensary licenses that would be issued before May 1, 2020, to sell cannabis. 410 ILCS 705/15-25(a) (West 2020). The licenses were dispersed among 17 different geographic regions in the state. *Id.* § 15-25(c). Applications were open until January 1, 2020. *Id.* § 15-25(b). Applications were evaluated on a 250-point rubric. *Id.* § 15-30(c). In theory, the available licenses would be granted to the

highest-scoring applicants. In practice, the number of "perfect score" applications far outnumbered the available licenses, requiring a lottery among the tied applicants.

¶ 11    Tyson Lance is an attorney who worked in the Chicago office of the law firm Kutak Rock, a defendant here. Shortly after the Act passed, Tyson approached a friend, Patrick Birotte, about partnering to apply for dispensary licenses as a "social equity applicant." (They eventually included others, Paul O'Grady and Juan Elias, in the initial plans to create the companies.)

¶ 12    Under the Act, a "social equity applicant," or "SEA," is "an applicant with at least 51% ownership and control by one or more individuals who have resided for at least 5 of the preceding 10 years in a Disproportionately Impacted Area." *Id.* § 1-10. An SEA received a 50-point boost to its application score. *Id.* § 15-30(c)(5).

¶ 13    Tyson had lived in a Disproportionately Impacted Area for the last six years, so to qualify, he only needed the requisite ownership and control over an applicant business. Tyson (and the other original organizers) retained Kutak Rock and attorney Christopher Parrington to create a limited liability company called PBKM, LLC (PBKM), a plaintiff here, that would own and operate the cannabis dispensaries. Parrington was selected as the lead attorney because he had an established cannabis law practice out of Kutak Rock's Minneapolis office.

¶ 14    As Tyson was both a client of and attorney with Kutak Rock, he was screened from accessing the files on this transaction and "play[ed] no role in the strategy, creation, or formation of the applicant entity, or drafting of the application documents." The amended complaint alleges that walling Tyson off from relevant information violated rules of professional conduct.

¶ 15                         II. The Term Sheet for PBKM

¶ 16    Though the initial term sheet for the transaction was not a legally binding document in itself, it is relevant here because the amended complaint alleges both that (1) the initial term

sheet was provided to Tyson and the original organizers only weeks before the applications for the licenses were due, and (2) the subsequent corporate documents Kutak Rock provided for the transaction deviated in material ways from what the term sheet had promised.

¶ 17   The amended complaint alleges that, despite hiring Kutak Rock in July 2019, Tyson did not receive the initial term sheet until December 19, two weeks before the application due date of January 2, 2020, with winter holidays in the interim.

¶ 18   The term sheet contemplated that PBKM would be a manager-managed LLC, run by a "board of managers," the number of which was intentionally omitted. Initially, Tyson would be the one and only manager. The members of PBKM would include not only the original organizers—Tyson, O'Grady, Elias, and Birotte—but also an entity called Cannabis Capital Group, LLC (Cannabis Group), which was owned by a man named Eddie Armstrong. (Both Cannabis Group and Armstrong are defendants.)

¶ 19   The amended complaint alleges that the original organizers had never intended to include Cannabis Group or Armstrong; they were other clients of the Kutak Rock attorney, Parrington, who was handling this matter. Tyson allegedly was advised that Cannabis Group had "significant cannabis business credentials" that "would bolster the application credentials of PBKM." The amended complaint alleges that Tyson and the other original organizers felt compelled to go along with Kutak Rock's plan because "time was slipping away."

¶ 20   Under the term sheet, Tyson would have an 87.5% economic and voting interest in PBKM, while the other members shared a 12.5% interest. Notably, the term sheet also required that Tyson issue "a revocable proxy" to give O'Grady, Elias, and Cannabis Group an additional 8.5% voting power among themselves—reducing Tyson's membership voting interest to 79%.

¶ 21    Membership voting interest is relevant here because, while the term sheet provided that a manager or "board of managers" would run the daily affairs of PBKM, certain larger decisions—which the term sheet styled "fundamental transactions"—required the concurrence of 80% of the voting interest of the members. "Fundamental transactions" included such major decisions as merging or consolidating with another company, incurring substantial debt, making substantial purchases or sales of company property, and initiating bankruptcy proceedings.

¶ 22    The term sheet contemplated that the actual entities applying for the cannabis licenses would not be PBKM but 10 subsidiary companies of PBKM known as "PBKM Dispensary 1, LLC" through "PBKM Dispensary 10, LLC." PBKM would own 75.5% of the subsidiaries, while "an unrelated third party"—not identified—would own 25.5%. The term sheet provided that PBKM "will be the managing member of each subsidiary entity."

¶ 23    The term sheet made no mention of a separate holding company that would directly own the 10 subsidiary dispensary companies, as ultimately came to pass.

¶ 24                          III. The Corporate Documents

¶ 25    The amended complaint alleges that Kutak Rock did not send Tyson the binding corporate documents until the eve of the application deadline. Specifically, on December 31, 2019—two days before the deadline—Kutak Rock demanded that Tyson and the other members of PBKM sign (1) hold-harmless documents, (2) conflict-of-interest waivers, and (3) the signature pages for the corporate documents before Kutak Rock would provide them the final corporate documents themselves. The amended complaint thus alleges that Tyson and the other original organizers signed these documents "under coercion and duress."

¶ 26    Then, on January 1, 2020, the day before the application deadline to the state, Kutak Rock sent all the relevant corporate documents. The amended complaint alleges that, without

- 6 -

consulting Tyson or the original organizers, Kutak Rock made unilateral changes to the term sheet, transforming the corporate structure into "something far more complicated than needed to achieve the Plaintiffs' legal objective."

¶ 27                    A. PBKM's Governing Structure

¶ 28    The PBKM Operating Agreement provided that the company would be manager-managed, with Tyson identified specifically in the agreement as the sole manager. As manager, Tyson had the authority to enter and execute agreements, control the finances, and generally run the business. But as the term sheet had promised, certain major or "fundamental" transactions—incurring substantial debt, selling the bulk of the company's property, initiating bankruptcy proceedings, and the like—required the approval of 80% of the members' voting interests.

¶ 29    The respective voting interests of the members is one notable way in which the PBKM Operating Agreement deviated from the initial term sheet. The voting proxy that Tyson would transfer to the other members, which would reduce Tyson's voting interest from 87.5% to 79%—notably below the 80% interest needed for approval of major decisions—was not labeled a "revocable" proxy in the PBKM Operating Agreement but an "*irrevocable*" one.

¶ 30    In the most notable deviation from the initial term sheet, the corporate documents created a subsidiary to PBKM, a holding company that would wholly own the ten dispensary LLCs applying for the licenses, instead of PBKM itself. This holding company was named PBKM Dispensary Holdings, LLC, which we will identify as "PBKM Holdings" throughout.

¶ 31                    B. PBKM Holding's Governing Structure

¶ 32    Like its parent company PBKM, the subsidiary PBKM Holdings was a manager-managed LLC. Its members were PBKM, which held a 75.5% interest, and an entity known as Trees Illinois LLC (Trees Illinois), a defendant here, which held a 24.5% interest. Again, the amended

complaint alleges that the original organizers never envisioned Trees Illinois or its members as a part of their company; the members of Trees Illinois were other clients of Kutak Rock who, like the Cannabis Group, claimed to have expertise in the cannabis business to buttress PBKM's overall application.

¶ 33     Unlike its parent PBKM, which had only one manager who was expressly identified as Tyson in the corporate documents, PBKM Holdings was governed by "no less than *three* managers," two of whom would be appointed by its parent PBKM, and one of whom would be appointed by Trees Illinois. Actions taken by the managers of PBKM Holdings required the approval of the "majority of the managers."

¶ 34                    C. The Individual Dispensaries' Governing Structure

¶ 35     Kutak Rock created 10 different individual dispensary LLCs to apply for cannabis licenses in various parts of the state. As noted, their names were all but identical, other than a number assigned to each of them: "PBKM Dispensary 1, LLC," "PBKM Dispensary 2, LLC," etc. For ease, we will refer to them individually as "PBKM-1", "PBKM-2," etc.

¶ 36     Each of the dispensary LLCs was *member*-managed. Its only member was PBKM Holdings. In other words, PBKM Holdings wholly owned each dispensary LLC.

¶ 37     In broad strokes, then, the corporate structure was such that PBKM owned a subsidiary, PBKM Holdings, which in turn wholly owned the subsidiary dispensary LLCs that would apply for the cannabis licenses.

¶ 38              IV. The State Initially Rejects Each PBKM Dispensary Application

¶ 39     On January 2, 2020, PBKM filed 10 applications, one for each of its dispensary LLCs, with the state.

¶ 40    In June 2020, state regulators sent "deficiency emails" to each of the 10 PBKM dispensary applicants. Substantively, each of the e-mails was identical. Regulators identified one of three problems with the applicants' compliance with social-equity requirements:

"In particular, the application did not provide sufficient evidence that:

• One or more persons asserting they resided in a disproportionately impacted area for at least 5 of the preceding 10 years did not provide sufficient documentation to support that assertion, and/or *did not provide sufficient documentation that the individual owns and controls a sufficient percentage of the dispensing organization alone or in conjunction with other proposed principal officers to qualify as a Social Equity Applicant*. and/or

• The applicant did not provide sufficient evidence to support its assertion that it is an Illinois resident." (Emphasis added.)

¶ 41    The amended complaint alleges that the state was identifying the second of these problems, highlighted above—that the applicants "did not provide sufficient documentation that [Tyson] owns and controls a sufficient percentage of the dispensing organization."

¶ 42    The deficiency letter informed the PBKM applicants that they had 10 calendar days to respond to the identified deficiencies.

¶ 43                    V. PBKM's Response to the Deficiency Letter

¶ 44    As best we can tell, each of the 10 dispensary applicants filed a response to the state. What we cannot tell with certainty is who prepared those documents. The amended complaint does not allege that Kutak Rock prepared the responses. Kutak Rock, in its brief, tells us that, "[a]fter *** January 2020, Kutak had no further role in work on the PBKM Dispensary LLCs' applications," though this information does not come to us via affidavit, nor is it something we

may judicially notice. (For what it's worth, it appears that a different law firm provided this legal work, but again, we cannot know with certainty.)

¶ 45    In any event, in those responses to the state's deficiency letter, PBKM made dramatic changes to the corporate structure. Specifically, the irrevocable voting proxy in the PBKM Operating Agreement was deleted, as were the 80% member-voting requirements for major transactions. PBKM Holdings was dissolved as a corporation. The 10 dispensary LLCs would be dissolved, as well, and PBKM—now the only surviving corporate entity—would "step into the shoes" of the individual dispensary LLCs.

¶ 46    What happened next is somewhat of a mystery. The amended complaint alleges that, "while Illinois allowed certain applicants who received deficiency or denial emails for the License to reapply," the PBKM dispensaries did not qualify to reapply "because regulators did not allow social equity control to be changed." Taking that statement as true at this stage, as we must, apparently none of the 10 PBKM dispensaries were allowed to cure their deficiencies.

¶ 47        V. Eight of Ten PBKM Dispensaries Receive Social-Equity Credit

¶ 48    Despite the fact that, according to the complaint, none of the PBKM dispensaries were permitted to make changes to their applications, the state's initial scoring of the applications produced a wildly anomalous result: though each of the 10 PBKM dispensary LLCs submitted identical applications, *eight of them received the full, 50-point credit for social-equity compliance in the re-scoring, while two of them—PBKM-2 and PBKM-9, the plaintiffs here— received no such credit*.

¶ 49    VI. The State Scores Applications and Adds Additional Licenses and Lotteries

¶ 50    In August 2020, in response to much criticism and confusion (and lawsuits) surrounding the scoring process, the Illinois Governor signed legislation that made several changes to the Act.

First, the state expanded the number of available licenses from 75 to 185. Second, the state allowed three lotteries, as opposed to the original one lottery. One lottery was for the applicants who placed highest in the original scoring; a second was for social-equity applicants only; and a third was for all "qualified" applicants.

¶ 51    None of the 10 PBKM dispensary LLCs received a place in the original lottery. Only applicants with perfect scores did, and none of the PBKM dispensaries received perfect scores, not even the eight PBKM dispensary LLCs that received full social-equity credit. (The apparent reason, not relevant here, is the state mysteriously awarded extra points to veteran-owned applicants, which gave those applicants the edge over everyone else.)

¶ 52    The amended complaint essentially stops there in the narrative.

¶ 53                    VII. The State Offers to Rescore Applications

¶ 54    In September 2020, state regulators issued a notice acknowledging that "[s]everal applicants that did not qualify for the lottery have raised concerns about the process the Department used to issue deficiency notices and other issues relating to the scoring process. Some applicants have raised these issues in lawsuits filed in state and federal court." The state announced that it would provide applicants who claimed to be scored unfairly "a supplemental deficiency notice." Namely, within 10 days, applicants who did not receive a perfect score could do one of the following:

> "(a) submit an amended application exhibit; (b) *request that the Department review any original application exhibit for potential scoring errors or inconsistencies* (*e.g., the same applicant submitted the identical supporting document for the same exhibit on multiple applications but did not receive the same score on each exhibit*); or (c) do nothing and keep the current score on that exhibit." (Emphasis added.)

¶ 55    Option (b), highlighted above, would appear to apply spot-on to the PBKM dispensary LLC applicants—they filed the identical application 10 times; 8 of those applications received perfect social-equity scores and the other 2 received no social-equity credit.

¶ 56    The amended complaint does not address what happened next. There are no allegations concerning what, if anything, PBKM did to bring the scoring inconsistences to the attention of state regulators. The amended complaint merely alleges that plaintiffs, PBKM-2 and PBKM-9, never qualified for any of the lotteries the state held, while the other eight PBKM dispensary LLCs did, in fact, qualify for the second and third lotteries—the social-equity lottery and the qualified-applicants lottery—though none of them won a dispensary license.

¶ 57                                    VIII. The Lawsuit

¶ 58    In the amended complaint, plaintiffs alleged legal malpractice and breach of fiduciary duty against Kutak Rock and Parrington (Counts I and II, respectively); breach of fiduciary duty and equitable estoppel against Trees Illinois, Cannabis Group, and their members (Counts III and IV, respectively); and aiding and abetting Kutak Rock's breach of fiduciary duty against Trees Illinois, Cannabis Group, and their owners (Count V).

¶ 59    The gravamen of the amended complaint is that, through their acts and omissions, defendants created or helped create a corporate structure that was noncompliant with state law, as it did not give Tyson the requisite ownership and control to qualify. Plaintiffs suffered damages in that they lost the chance to participate in the lottery for a cannabis license.

¶ 60    The circuit court dismissed the amended complaint. The court ruled first that the corporate structure Kutak Rock created did, in fact, give Tyson the requisite ownership and control over the PBKM dispensary LLCs under state law. Thus, the court found no breach of duty—no legal malpractice—as a matter of law. Second, the court ruled that plaintiffs' claimed

damages were not compensable, as the likelihood of winning a lottery was remote, and Illinois law did not allow plaintiffs to recover for "lost chance" damages. This appeal followed.

¶ 61                                ANALYSIS

¶ 62    This case arrives via dismissal under section 2-615 of the Code of Civil Procedure. We accept as true the well-pleaded facts of the complaint and draw all reasonable inferences in favor of the plaintiffs. *Cahokia Unit School District No. 187 v. Pritzker*, 2021 IL 126212, ¶ 24. A section 2-615 motion should not be granted "unless it is clearly apparent that no set of facts can be proved that would entitle the plaintiff to recovery." *FourKites, Inc.*, 2024 IL 129227, ¶ 18.

¶ 63    A motion under section 2-615 is limited to arguments appearing on the face of the complaint. *O'Callaghan v. Satherlie*, 2015 IL App (1st) 142152, ¶¶ 18, 19. But a court may consider matters subject to judicial notice. *Id.* ¶ 18. We review the court's judgment *de novo*. *FourKites, Inc.*, 2024 IL 129227, ¶ 18.

¶ 64    Here, the parties focus on the two bases for the court's dismissal: (1) that, as a matter of law, Tyson had the requisite control for the companies to qualify as SEAs, and thus no negligent act—no legal malpractice—occurred, and (2) "lost chance" damages are not available outside of medical malpractice and thus not available to any of the claims here. We take them in that order.

¶ 65                                  I

¶ 66    The circuit court ruled, as a matter of law, that Kutak Rock properly prepared the corporate documents, such that the various PBKM dispensaries, including plaintiffs PBKM-2 and PBKM-9, qualified as social-equity applicants under the Act. Because Kutak Rock committed no negligent act, claims against Kutak Rock and attorney Parrington based on legal malpractice and breach of fiduciary could not lie; there was no breach of duty.

¶ 67    As we explain below, we are highly skeptical that the corporate documents gave Tyson the requisite control over the dispensaries, but we are not prepared to land on that question one way or the other. In any event, dismissal on this ground was inappropriate.

¶ 68    Again, the Act defines a social-equity applicant as "an applicant with at least 51% *ownership and control* by one or more individuals who have resided for at least 5 of the preceding 10 years in a Disproportionately Impacted Area." (Emphasis added.) 410 ILCS 705/1-10 (West 2020). The key disputed phrase is "ownership and control," defined as "ownership of at least 51% of the business, including corporate stock if a corporation, and control over the management and day-to-day operations of the business and an interest in the capital, assets, and profits and losses of the business proportionate to percentage of ownership." *Id.*

¶ 69    The "ownership" part of this phrase is not contested; there is no dispute that Tyson owned at least 51% of the relevant companies. Recall that, under the three-tier structure Kutak Rock set up, Tyson owned 87.5% of PBKM; PBKM owned 74.5% of PBKM Holdings; and PBKM Holdings owned 100% of each of the 10 Dispensary LLCs. Doing the math, Tyson effectively had just over 65% ownership of PBKM Holdings and thus of each subsidiary dispensary LLC, which more than clears the 51% threshold requirement for ownership.

¶ 70    But the question of "control" is another story. At defendants' urging, the circuit court relied on two bases for determining that Tyson had sufficient "control" over the dispensary LLCs to satisfy the Act.

¶ 71    For one, the court was moved by the fact that 8 of the 10 dispensary LLCs, with the identical corporate structure as PBKM-2 and PBKM-9, ultimately received the full social-equity credit with state regulators. The court wrote that "the award of SEA points to [the other eight dispensaries] is dispositive that Tyson had the requisite ownership and control of PBKM 2 & 9."

We understand that the law of averages would suggest that if, looking at the identical corporate structure 10 different times, regulators were satisfied 8 times and dissatisfied twice, it is more likely that the regulators were correct 8 times and wrong twice than correct twice and wrong 8 times.

¶ 72    But we would not go so far as to call it "dispositive." We know very little with certainty. All we can say for sure is that there is an inconsistency: regulators accepted the identical corporate structure eight times and rejected it twice. The regulators were wrong one way or the other; that is all we know. And the notion that the eight approvals might have been in error, and the two rejections correct, is not as far-fetched as it may appear. We do not know, for example, whether 10 different individuals reviewed the 10 different applicants—8 saying "yay" and 2 "nay"—or whether one person reviewed multiple applications. Consider an extreme (though entirely possible) example: One individual reviewed and approved all 8 of the successful applications, while a separate individual reviewing the applications of PBKM-2 and PBKM-9 had a different take and rejected those applications. Then the law of averages would be a wash; one regulator thought the applications were sufficient and one did not.

¶ 73    The long and short is that we can assume nothing dispositively about the discrepancy in the regulators' opinions regarding these 10 PBKM dispensary applications. And we are doubly cautious considering that we are at the pleading stage, where we must draw all reasonable inferences in favor of the complaint. *O'Callaghan*, 2015 IL App (1st) 142152, ¶ 18.

¶ 74    The second basis for the court's conclusion, again urged by defendants, was that the operating agreement for PBKM gave sufficient "control" to Tyson. As far as that analysis goes, we agree, but whether Tyson had control of *PBKM* is not the question. PBKM wasn't applying for a license; each of the 10 dispensary LLCs were. The critical question is whether Tyson had

control of the *individual dispensaries*, PBKM-1 through PBKM-10. And from our review of the documents attached to the amended complaint and included in the record, we are skeptical, to say the least, that Tyson had control of those individual PBKM dispensary LLCs.

¶ 75    Again, "control" means "control over the management and day-to-day operations of the business." 410 ILCS 705/1-10 (West 2020). We agree with the circuit court that Tyson had "control," as the Act defines it, of PBKM itself, the parent corporation. Section 5.1 of the PBKM Operating Agreement identified Tyson, by name, as the sole manager of the manager-managed LLC and gave him "the power and authority to act for and on behalf of the Company in the regular, ordinary and usual course of the Company's business." That is as close as the language could come to describing day-to-day authority without parroting the statute itself.

¶ 76    True, as plaintiffs note, section 5.3 reserved certain major company decisions to a vote of the members and required the concurrence of 80% of the members. This provision will be relevant later in our analysis, but for present purposes, it does nothing to change the fact that Tyson had "control" of PBKM. Those major decisions, reserved for the members, included: entering into a merger or consolidation with another company; incurring significant debt; selling most or all of the company's property; issuing additional shares or interests in the company; and instituting bankruptcy proceedings. We agree with the circuit court that major decisions of this nature are not part of the day-to-day running of the business. See 805 ILCS 180/15-1(c), (d) (West 2020) (for manager-managed LLCs, "any matter relating to the business of the company may be exclusively decided by the manager," subject to major decisions listed in subsection (d), on which members may vote).

¶ 77    The circuit court stopped there. But as noted, PBKM was not the applicant for the licenses, nor did PBKM own the dispensary LLCs that applied for the licenses. In the structure

- 16 -

Kutak Rock set up (which plaintiffs allege was not what they wanted or expected, but they were given no time to object), PBKM owned PBKM Holdings, which in turn owned the 10 individual dispensary LLCs. So proceeding methodically, we next turn to whether Tyson had "control," for purposes of the Act, of PBKM Holdings. That requires a review of the Operating Agreement for PBKM Holdings—a document that neither plaintiffs nor defendants have analyzed in any meaningful way.

¶ 78    Not surprisingly, the Operating Agreement for PBKM Holdings largely follows the same format as the one for PBKM itself, so the relevant language again appears in section 5.1. Like its parent PBKM, PBKM Holdings is a manager-managed LLC. But in contrast, PBKM Holdings is governed by "no less than *three* managers," two of whom are appointed by PBKM, and one of whom is appointed by Trees Illinois (the other entity that owns part of PBKM Holdings, along with PBKM).

¶ 79    From this language, we cannot say with any certainty that Tyson would have control of PBKM Holdings' day-to-day operations. He is not listed as a manager, which by itself is interesting, given that the operating agreement for PBKM went to the trouble of naming him expressly. And even if he were appointed manager, he would be one of three. Section 5.1 makes clear that actions taken by managers require the approval of the "majority of the managers," or two of three. Having a one-third say is not "control" in any logical or natural sense of the word.

¶ 80    In theory, it is possible that both Tyson and another person who qualified under the social-equity rules would be appointed managers of PBKM Holdings, and two out of three managers who satisfy the social-equity rules would have sufficed for "control" of the management under the Act. See, *e.g.*, 410 ILCS 705/1-10 (West 2020) (applicant must have "at

least 51% ownership and control by *one or more individuals* who have resided for at least 5 of the preceding 10 years in a Disproportionately Impacted Area" (emphasis added)).

¶ 81     But the amended complaint does not allege who, if anyone, were appointed managers of PBKM Holdings. Nor is it clear to us who would have appointed them. PBKM was allowed to appoint two of the managers, but would that be a decision for the manager of PBKM (Tyson) or a more major decision reserved to the members, requiring the agreement of 80% of the membership voting interest? And recall that Tyson's membership voting percentage was 79%.

¶ 82     This entire analysis of the operating agreement for the subsidiary PBKM Holdings comes from our reading of that document in the record, without any substantive analysis from either party. Plaintiffs did not discuss this operating agreement at all. Kutak Rock, in its brief, told us that "[t]wo documents are outcome determinative on whether Tyson had the requisite ownership and control—the Cannabis Act and the [PBKM] Operating Agreement." No mention whatsoever of the operating agreement of PBKM Holdings.

¶ 83     So we are reluctant to reach final conclusions. But we can comfortably say that it is not clear at all that Tyson had "control," as the Act defines it, of the subsidiary, PBKM Holdings.

¶ 84     And that matters because PBKM Holdings owned 100% of each of the 10 PBKM dispensary LLCs that applied for licenses. The operating agreement for each of the PBKM dispensaries, from what we can tell, calls for a *member*-managed LLC, given the lack of any mention anywhere of the word "manager." See 805 ILCS 180/15-1(a) (West 2020) (LLC is presumed to be member-managed unless operating agreement expressly provides that it is manager-managed).

¶ 85     And there is only one member of each dispensary LLC: PBKM Holdings. Meaning the only entity that could have been managing the day-to-day operations of the individual

dispensaries—thus having "control" of those dispensaries under the Act—is PBKM Holdings. And as just discussed, it appears that Tyson did not "control" PBKM Holdings. So we are very far from agreeing with defendants and the circuit court, as a matter of law, that Tyson had "control" over the individual dispensaries that applied for these licenses, as the Act requires.

¶ 86    Given the lack of briefing on these relevant points, particularly concerning the second and third tiers of this corporate structure, we are reluctant to reach a final conclusion one way or the other on the question of "control." But that is enough to overturn the circuit court's judgment on this ground. If there is more to say on these points than we have, the circuit court should be open to the parties' arguments on them. And the parties should do on remand what they did not do initially—discuss *all* the operating agreements and how they interact with one another, so the circuit court is given all the relevant information.

¶ 87                                            II

¶ 88    We next reach the thornier question of whether plaintiffs are entitled to damages. Plaintiffs here are PBKM and the two dispensary LLCs that never received social-equity credit, PBKM-2 and PBKM-9. Because they never received that credit, their applications were never scored highly enough to be eligible for a dispensary license (or to be eligible for any of the three lotteries that were held for the licenses).

¶ 89    Quite obviously, there is no guarantee that either PBKM-2 or PBKM-9 would have won any of the lotteries had they qualified for them. Quite the contrary, in fact; their chance of success would have been very small—the low single digits, if more than a single percent, depending on the number of competing applicants in the relative region and the relative lottery.

¶ 90    Defendants say that this exceedingly low probability of success is fatal to plaintiffs' claims. Under the traditional standards of a legal negligence case, they say, plaintiffs cannot

prove that *it is more likely than not* that, but for Kutak Rock's negligence, plaintiffs would have obtained a license.

¶ 91    Plaintiffs respond by invoking the "lost chance" doctrine, which has been applied in Illinois in the context of medical-malpractice claims but never in any other area of professional malpractice. They say that their loss of a chance to win the lottery is compensable and easily calculable, given that the odds of winning a lottery can be determined by simple math, and the value of a cannabis dispensary license would be the subject of routine expert testimony.

¶ 92    For the reasons we explain below, the exceptionally unique facts here make this case appropriate for "lost chance" damages. We emphasize at the outset that we limit our holding to the unique facts of this case and do not comment more broadly on whether "lost chance" damages would be available in any other legal-malpractice action.

¶ 93    The "lost chance" doctrine arose because courts confronted cases where medical malpractice may have occurred, but ultimately the plaintiff patient probably would have suffered the same fate even absent the malpractice. The alleged malpractice may have *lessened* the plaintiff's odds of a successful health outcome and thus made the plaintiff's injury more likely, but not by more than 50%. So under traditional proximate-cause standards, the plaintiff could not prevail—she could not prove that the malpractice *more likely than not* caused the bad health outcome. The "lost chance" doctrine allows damages for that lessened chance of recovery, even though that "chance" was less than 50%. Consider an easy example.

¶ 94    Say a doctor misdiagnoses a tumor as benign when it was cancerous, resulting in a yearlong delay in treatment, by which time the tumor is inoperable, and the plaintiff has no chance of survival. But expert testimony shows that, even had she been promptly treated—even if no malpractice occurred—the plaintiff's chance of survival was only 30%.

¶ 95    Because that plaintiff's chance of survival, absent malpractice, was not greater than 50%, she cannot prove that the malpractice *more likely than not* caused her death. That is, under traditional, garden-variety negligence principles, that plaintiff would not be able to recover, regardless of the fact that the malpractice lessened her chance of survival by 30%. See, *e.g.*, *Russell v. Subbiah*, 149 Ill. App. 3d 268, 272 (1986) (affirming summary judgment for defendant where evidence showed 50/50 chance—not greater than 50% chance—that doctor's negligence contributed to plaintiff's bad health outcome); *Curry v. Summer*, 136 Ill. App. 3d 468, 476-80 (1985) (noting in *dicta* that plaintiff must show better than even chance of survival absent alleged malpractice to sustain burden of proof on proximate cause).

¶ 96    Illinois law now provides a remedy to that plaintiff. A plaintiff may recover when a medical professional "deprived the plaintiff of a chance to survive or recover from a health problem, or where the malpractice has lessened the effectiveness of treatment or increased the risk of an unfavorable outcome to the plaintiff." *Holton v. Memorial Hospital*, 176 Ill. 2d 95, 111 (1997). The proximate-cause analysis remains unchanged, but rather than the plaintiffs having to prove that the negligence proximately caused their *death* (or other adverse health result), they need only prove that "the defendant's malpractice *** proximately caused the increased risk of harm or lost chance of recovery." *Id.* at 119. As our supreme court put it, Illinois has "recognized that victims of medical malpractice should be able to seek damages arising from their doctors' or hospitals' negligent treatment, notwithstanding that the patients' chance of recovering from existing illnesses or injuries may be less than 50%." *Id.* at 112.

¶ 97    Plaintiffs ask us to recognize this doctrine under the facts of this case. They obviously cannot prove that defendants' alleged legal negligence more likely than not cost them a cannabis dispensary license; the most Kutak Rock could have done is make them *eligible* for a license

and then hope for the best in a lottery, where their chances were far less than 50%. But plaintiffs say they *can* show that defendants' (alleged) legal negligence more likely than not cost them a *chance* at winning the lottery—a chance at a dispensary license. And they should be compensated for that lost chance, however small that chance may have been.

¶ 98    Does the "lost chance" doctrine translate to claims of *legal* malpractice? The concurring justice in *Holton*, who argued against adopting the "lost chance" doctrine in medical-malpractice cases, thought so: "There is *** no clear, principled reason why the lost chance doctrine should not be applied in malpractice actions against other professionals." *Id.* at 139 (Heiple, C.J., specially concurring). Indeed, one court refused to recognize the doctrine in the context of *medical* malpractice for fear that it would logically and inevitably transfer to legal malpractice claims. *Kramer v. Lewisville Memorial Hospital*, 858 S.W.2d 397, 406 (Tex. 1993).

¶ 99    Illinois courts have not squarely addressed this issue. Other courts, for various reasons, have declined to extend the "lost chance" doctrine to claims of legal malpractice or, at least, to the particular legal malpractice action before them. See, *e.g.*, *Drollinger v. Mallon*, 260 P.3d 482, 491 (Or. 2011) (*en banc*); *Rivers v. Moore, Myers & Garland, LLC*, 2010 WY 102, ¶ 27, 236 P.3d 284, 293-94 (Wyo. 2010); *Daugert v. Pappas*, 704 P.2d 600, 604 (Wash. 1985).

¶ 100  The principal point of contrast is in the certainty of proof of a lost chance in medicine versus the law. Medicine has advanced to the point that, in many cases, an expert could put a statistical percentage on the likelihood of a certain individual recovering from a certain malady if promptly and properly treated. As one supreme court elaborated:

> "The critical prerequisite to employment of loss of a chance in the medical context is the existence of reliable statistical information, gleaned from rigorous studies that are typically generated outside the context of litigation, as to the survival rates of patients

who are classified by reference to various objective characteristics. This is the sort of information that tells us that a Hispanic woman who is forty years old, and presents a certain medical profile, has a thirty percent chance of surviving a cancer of a given type if it is diagnosed and treated in a certain way." (Internal quotation marks omitted.) *Rivers*, 236 P.3d at 294.

See *Smith v. Providence Health & Services-Oregon*, 393 P.3d 1106, 1115-16 (Or. 2017) ("The loss-of-chance theory also functions in the context of medical malpractice actions because, at least in some instances of alleged negligence, ample reliable scientific evidence about the statistical probability of various medical outcomes is available."); *Drollinger*, 260 P.3d at 491 (in medicine, "statistical evidence that can fill the void is readily available"); *Matsuyama v. Birnbaum*, 890 N.E.2d 819, 834-35 (Mass. 2008) ("reliable expert evidence establishing loss of chance is more likely to be available in a medical malpractice case than in some other domains of tort law"), *abrogated on other grounds by Doull v. Foster*, 163 N.E.3d 976 (Mass. 2021).

¶ 101 Our supreme court has likewise emphasized the availability of reliable statistical evidence in medical-malpractice cases. In holding that a plaintiff may recover in a medical-malpractice action for the increased risk of future harm, which it likened to a variation of "lost chance" damages, the court noted that "scientific advances now enable the medical community to more accurately determine the probability of future injuries than in the past. The risk therefore of undue speculation is lessened." *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 503 (2002).

¶ 102 In contrast, courts have found the ability to predict the loss of a chance in legal malpractice claims to be far less certain. This point is most often made in the context of the prototypical legal-malpractice action, the so-called "case within a case," where the plaintiff

claims that the defendant attorney's negligent representation in an earlier legal proceeding proximately caused an unfavorable result in that proceeding. The point is that, while a medical patient's likelihood of an improved outcome, if properly treated, may be reducible to a percentage, the likelihood of a better outcome in a legal proceeding is far less predictable. See *Drollinger*, 260 P.3d at 491. As one court put it:

> "There is simply no comparable ground motivating the adoption of loss of a chance in legal malpractice. Because we are dealing with outcomes determined almost entirely by human interactions, rather than events dominated by biological processes, there is now, and may always be, a dearth of controlled studies and meaningful statistical information that might permit a qualified expert justifiably to assign a percentage chance of success to a given type of legal claim. *** In short, the jury in a legal malpractice claim is not being presented with sound statistical information as to whether, absent malpractice, this sort of client, in this sort of circumstance, has a three in ten chance of prevailing. Rather, the jury is necessarily required to consider the 'case within the case' as a one-off event. Thus, *** loss of a chance seems out of place in the realm of legal malpractice." (Internal quotation marks omitted.) *Rivers*, 236 P.2d at 294.

¶ 103  Those concerns seem perfectly valid. But the case before us is materially different. First, our appeal does not involve a "case within a case." This is a transactional malpractice case; plaintiffs allege that Kutak Rock was negligent in drafting corporate documents to qualify them for an adult-use cannabis dispensary license. Does that make a difference?

¶ 104  At least one court has said no. In *Rivers*, the plaintiff alleged that the defendant attorney failed to properly advise him about the effect of a restrictive covenant that limited the size of the building he could construct on land he purchased. *Id.* at 286. As part of his malpractice claim,

the plaintiff sought damages based on his inability to build a larger building. *Id.* at 286-87. The

plaintiff claimed that his expectancy damages were recoverable under the loss-of-chance

doctrine. *Id.* at 293.

¶ 105  The Wyoming Supreme Court concluded that "this is not the type of case for which a claim

may be made under the loss-of-chance doctrine." *Id.* Without wholly foreclosing a future "lost

chance" claim in a legal-malpractice action, the court found that "[t]his case simply does not

present circumstances in which the odds must be calculated to determine whether an opportunity

was lost." *Id.* at 294.

¶ 106  Our case, on the other hand, presents those very circumstances. Indeed, what makes this

case something of a unicorn—and the reason we limit our holding precisely to our facts—is that

we are presented here with the seemingly rare case where plaintiffs cannot merely provide

statistics to a reasonable degree of certainty but to a *mathematical* certainty.

¶ 107  The plaintiffs claim here that, due to Kutak Rock's malpractice, they lost a chance to

participate in the lotteries the state held for cannabis dispensary licenses. Each of the two

dispensary LLCs that lost that chance, PBKM-2 and PBKM-9, would have entered lotteries

along with a number of other applicants. Their chance of winning was easily calculable. To keep

it simple, if PBKM-2 were one of a hundred applicants, and all applicants received the same

scoring weight, each applicant would have a one-in-a-hundred, or 1% chance of winning. If the

scoring weight were not equal (we do not know), then that factor could be included in the

calculation, too—just a matter of simple or slightly complex math.

¶ 108  Indeed, in their briefs, defendants did that math, showing us how low each dispensary's

likelihood of winning one of the lotteries would have been. We are not here to say whether those

numbers are accurate; that will be for the circuit court on remand, if things ever advance that far.

Defendants are surely correct that the percentages are low—perhaps even less than a single percent in some cases. But how big or small the percentage may be is of no import; what matters is they are not only calculable but calculable to a mathematical certainty. The miniscule nature of the lost chance will obviously be relevant to damages but not to liability.

¶ 109  Though we understand the caution of courts to extend the "lost chance" doctrine to legal malpractice, none of the vagaries in the typical legal-negligence case is present here. We do not have to calculate the percentage likelihood that a particular legal claim might have persuaded a jury of twelve people, or the percentage likelihood that this mistake or that one by a lawyer would have impacted twelve jurors such that they would reached a different verdict or awarded more or less damages. There is literally no human element here whatsoever. These numbers, in fact, are far more reliable than in *medical*-malpractice actions, which only require proof of a chance to a "reasonable degree of medical certainty." *Holton*, 176 Ill. 2d at 119.

¶ 110  So we emphatically limit our holding here to the unique facts of this case. We make no comment on whether the "lost chance" doctrine could apply to the prototypical legal malpractice action involving a "case-within-a-case." Nor do we comment on whether any other type of legal-malpractice case would be appropriate for the "lost chance" doctrine. This case is undeniably unique. Indeed, we cannot even conjure another example, aside from participation in a lottery, where the lost chance could be computed to a mathematical certainty.

¶ 111  If this result seems odd, then consider this example. Imagine our same facts, but instead of hundreds of applicants, there was only one applicant for one available license worth tens of millions of dollars, and one of our plaintiffs was denied the chance to be the second applicant due to legal malpractice. Had our plaintiff applied, the state would have held a lottery in which each applicant obviously would have had a 50% chance of winning. But of course, as we have

explained at length, a 50% chance of winning does not satisfy the more-likely-than-not causation standard. So under traditional legal-negligence principles, that plaintiff would have no claim against its lawyer.

¶ 112 Does that seem like something the law would countenance? We think not. The plaintiff in that scenario had, to a mathematical degree of certainty, a 1-in-2 chance of winning a license worth millions, but its loss of that chance is worth *nothing*?

¶ 113 Our situation is no different, except that our plaintiffs had something closer to a 1-in-100 chance than a 1-in-2 chance. Obviously, in terms of damages, our plaintiffs would receive far less than our hypothetical plaintiff with the 50/50 chance. But the principle is no different.

¶ 114 We cannot criticize the circuit court for not applying the "lost chance" doctrine to this case without binding authority. But we hold that "lost chance" damages are available under the unique circumstances of this case as to plaintiffs' claim of legal malpractice.

¶ 115 We reverse the dismissal of Count I, sounding in legal malpractice against Kutak Rock and the individual attorney, Parrington.

¶ 116                                              III

¶ 117 Count II sounds in breach of fiduciary duty against the same defendants as Count I, Kutak Rock and Parrington. A claim for breach of fiduciary duty, when the source of the duty is the attorney-client relationship, is no different than a claim of legal malpractice. *Pippen v. Pedersen & Houpt*, 2013 IL App (1st) 111371, ¶ 23. In fact, when such a claim involves the same operative set of facts and the same resulting injury, "the breach of fiduciary duty claim is duplicative of the malpractice claim and should be dismissed." *Id.* Kutak Rock sought dismissal on this ground below but does not on appeal. Still, we may affirm a dismissal on any basis in the record. *Mullins v. Evans*, 2021 IL App (1st) 191962, ¶ 25.

¶ 118  Count II alleges the same injury as Count I: the corporate documents did not qualify PBKM-2 and PBKM-9 as social-equity applicants, and thus they were ineligible for a license. The same operative set of facts, the same background story, apply as well. True, Count II focuses on defendants' alleged ethical lapses—freezing out their client, acting with a conflict of interest, involving other clients in the corporate transaction without informing plaintiffs until it was too late for them to object—whereas Count I alleges simply that defendants negligently prepared the corporate documents.

¶ 119  But that alleged ethical misconduct is already part of the allegations common to all counts, and it was the allegedly negligent drafting of the corporate documents themselves, in the end, that allegedly resulted in those two dispensary LLCs being denied eligibility. We see these two counts as duplicative and thus affirm the dismissal of Count II on that ground. Nothing we have said would necessarily prevent plaintiffs from trying to introduce these alleged ethical breaches as evidence of negligence; the trial court can decide whether they are relevant.

¶ 120                                        IV

¶ 121  That leaves counts III through V, directed at Cannabis Group and its member. (They are also directed at Trees Illinois and its member, but that portion of the case is not under appeal, so we are concerned only with Cannabis Group and its member.)

¶ 122  The claims, respectively, are for breach of fiduciary duty (with no allegation, obviously, of an attorney-client relationship), equitable estoppel, and aiding and abetting breach of fiduciary duty. But the ultimate damages claimed against Cannabis Group and its member are the same "lost chance" damages. And now we are far from the field of professional negligence. Plaintiffs have cited no case law or made any argument whatsoever as to whether the "lost chance" doctrine would apply beyond the field of professional malpractice to other freestanding

tort claims. They have forfeited any such argument. Ill. S. Ct. R. 341(h) (eff. Feb. 6, 2013); *CE Design, Ltd. v. Speedway Crane, LLC*, 2015 IL App (1st) 132572, ¶ 18. So we affirm the dismissal of Counts III, IV, and V.

¶ 123                               CONCLUSION

¶ 124   The judgment of the circuit court is reversed as to Count I and remanded for further proceedings. We affirm the dismissal of all other counts.

¶ 125   Affirmed in part, reversed in part, and remanded.

*PBKM, LLC v. Kutak Rock, LLP*, 2024 IL App (1st) 230033

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 21-L-7458; the Hon. Daniel J. Kubasiak, Judge, presiding. |
| **Attorneys for Appellant:** | Gary A. Grasso and Adam R. Bowers, of Grasso Law, P.C., of Hinsdale, for appellants. |
| **Attorneys for Appellee:** | Peter D. Sullivan and Barry F. MacEntee, of Hinshaw & Culbertson LLP, of Chicago, for appellees Kutak Rock, LLP, and Christopher P. Parrington.<br><br>Michael S. Shapiro and Michael P. Tomlinson, of Tomlinson & Shapiro, P.C., of Chicago, for other appellees. |